# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NANCI KOSCHMAN, individually, and on behalf of The Estate of David Koschman, <br><br> Plaintiff, <br><br> v. <br><br> The CITY OF CHICAGO, Former CPD Detectives RONALD YAWGER, RITA O'LEARY, JAMES GILGER, NICK SPANOS, ROBERT CLEMENS, and ANTHONY GIRALAMO; former CPD Superintendent PHIL CLINE; former CPD Deputy Superintendents STEVEN PETERSON and ERNEST BROWN; former CPD Chief of Detectives TOM BYRNE; former CPD Deputy Chief of Detectives DEAN ANDREWS; former CPD Commanders GARY YAMASHIROYA, JOSEPH SALEMME, and STEVEN CHASEN; former CPD Lieutenants DENIS WALSH and Richard RYBICKI; former CPD Sergeants SAM CIRONE and THOMAS FLAHERTY; former CPD IAD Sergeant RICHARD DOWNS; former CPD Commanding Officer of Legal Affairs, MAUREEN BIGGANE; former CPD Superintendent JODY WEIS; former CPD officials John Does 1-3; COOK COUNTY; former Assistant State's Attorney DARREN O'BRIEN; Cook County State's Attorney ANITA ALVAREZ; former Cook County State's Attorney RICHARD DEVINE; SAO Chief of Staff DANIEL KIRK; RICHARD J. VANECKO, and DALEY family members and/or associates JOHN DOES 4-6, <br><br> Defendants. | No. _____ <br><br><br> **JURY DEMAND** |

## COMPLAINT

Plaintiff NANCI KOSCHMAN, for her complaint against the above-named Defendants, alleges as follows:



## JURISDICTION AND VENUE

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). There is jurisdiction over Plaintiff's state law claims pursuant to the Court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

2.      Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside in or formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## PARTIES

3.      Plaintiff Nanci Koschman is the mother of David Koschman, and the Administrator of his Estate. She is a resident of Cook County and a citizen of the United States.

4.      Defendants Ronald Yawger, Rita O'Leary, Robert Clemens, and Anthony Giralamo were duly appointed and sworn Chicago Police detectives who in 2004 were assigned to the Detective Division at Area 3.

5.      Defendants James Gilger and Nick Spanos were duly appointed and sworn Chicago Police detectives who in 2011 were assigned to the Detective Division at Area 5.

6.      Defendant Thomas Flaherty was a duly appointed and sworn Chicago Police Sergeant who in 2011 was assigned to the Detective Division at Area 3.

7.      Defendant Sam Cirone was a duly appointed and sworn Chicago Police Sergeant who was assigned to the Detective Division at Area 5 in 2011.

8.      Defendant Richard Downs was a duly appointed and sworn Chicago Police Sergeant who in 2011 was assigned to the Internal Affairs Division (IAD).

9.     Defendants Richard Rybicki and Denis Walsh were duly appointed and sworn Chicago Police Lieutenants who were assigned to the Detective Division at Area 3 in 2004 and 2011 respectively.  Walsh's father is former Deputy Superintendent of Police Jack Walsh and his sister-in-law is Carol Wiengart, who was on the security detail of former Chicago Mayor Richard M. Daley.

10.     Defendant Maureen Biggane was a duly appointed and sworn Chicago Police Lieutenant who in 2011 was the commanding officer of the Chicago Police Department's Legal Affairs Unit.

11.     Defendant Steven Chasen was in 2004 the duly appointed and sworn Chicago Police Commander of the Detective Division at Area 3.

12.     Defendant Gary Yamashiroya was in 2011 the duly appointed and sworn Chicago Police Commander of the Detective Division at Area 3.

13.     Defendant Joseph Salemme was in 2011 the duly appointed and sworn Chicago Police Commander of the Detective Division at Area 5.

14.     Defendant Dean Andrews was in 2011 the duly appointed and sworn Chicago Police Deputy Chief of Detectives.

15.     Defendant Tom Byrne was in 2011 the duly appointed and sworn Chicago Police Chief of Detectives.

16.     Defendants Steven Peterson and Ernest Brown were in 2011 duly appointed and sworn Chicago Police Deputy Superintendents.

17.     Defendant Phil Cline was the duly appointed and sworn Chicago Police Superintendent in 2004, and, during his tenure as Superintendent, was responsible for the policies, practices, and customs complained of herein.

3

18.     Defendant Jody Weis was the duly appointed and sworn Chicago Police Superintendent in 2011, and, during his tenure as Superintendent, was responsible for the policies, practices, and customs complained of herein. He is sued in his official capacity only.

19.     Defendants John Does 1-3 are Chicago police officials who participated in the cover-up alleged herein.

20.     Defendant Darren O'Brien was a duly employed Assistant State's Attorney of Cook County and in 2004 served as the Chief of the State's Attorney's Felony Review Unit. He began his career in 1984 as an assistant state's attorney under former Cook County State's Attorney Richard M. Daley.

21.     Defendant Richard Devine was the duly elected State's Attorney of Cook County in 2004. He was a close personal and political associate of Richard M. Daley and served as Daley's First Assistant State's Attorney from 1981 to 1983.

22.     Defendant Anita Alvarez was defendant Devine's Chief Deputy State's Attorney in 2004 and the duly elected State's Attorney of Cook County in 2011. She also served as an assistant state's attorney during Richard M. Daley's tenure as State's Attorney of Cook County.

23.     Defendant Daniel Kirk was in 2011 Chief of Staff for the Cook County State's Attorney.

24.     Unsued co-conspirator John Gorman was in 2004 the press secretary for the Cook County State's Attorneys' Office.

25.     Unsued co-conspirator Sally Daly was in 2011 the communications director for the Cook County State's Attorneys' Office.

26.     At all times relevant to this action, each of the individual City and County defendants named above acted in the scope of his or her employment, and under the color of the

4

laws, regulations, ordinances and customs of the City of Chicago, the County of Cook, and the State of Illinois. Each defendant's actions constituted "state action" as defined under federal law. Each defendant, except defendant Weis, is sued in his or her individual capacity.

27.     Defendant City of Chicago is an Illinois municipal corporation. The City of Chicago operates the Chicago Police Department ("CPD") and is or was the employer of each of the Defendant Chicago Police Officers and other city governmental officials

28.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office ("SAO"). Cook County and the SAO were the employers of Defendants O'Brien, Devine, Alvarez, Kirk, Gorman, and Daly and is a necessary party to this lawsuit.

29.     Defendant Richard J. Vanecko is the son of Dr. Richard Vanecko and Mary Daley Vanecko, the nephew of former Chicago Mayor Richard M. Daley and Michael Daley, and the cousin of Katherine Daley.

30.     Defendants John Does 4-6 are Daley family members and/or close associates who participated in the cover-up alleged herein.

31.     Co-conspirators Craig Denham, Kevin McCarthy, and Bridget McCarthy are close friends and associates of defendant Richard J. Vanecko and the Daley family.

## ALLEGATIONS OF FACT

### The Assault on Division Street and the Aftermath

32.     David Koschman was struck and killed in the early morning hours of April 25, 2004 by defendant Richard J. Vanecko while walking on Division Street in Chicago's Old Town neighborhood.

33.    Earlier that evening, on the night of April 24, an engagement party had been held at a nearby restaurant for Katherine Daley, a niece of then Chicago Mayor Richard M. Daley. Among the guests at the party were unsued co-conspirators Craig Denham, Kevin McCarthy, and Bridget McCarthy, who were friends of Daley family members, and Richard J. Vanecko, one of Mayor Daley's nephews and the grandson and namesake of former Chicago mayor Richard J. Daley.

34.    Vanecko, Denham, and Bridget and Kevin McCarthy left the party and went to a bar called the Pepper Canister, where they continued drinking. At about 3:15 a.m. on the morning of April 25, all four took a cab from the bar to the area of Division and Wells Streets and began walking east on Division.

35.    While walking along Division, Vanecko and his companions encountered David Koschman and several of his friends—Scott Allen, James Copeland, and David Francis—who were walking west along Division Street. As the groups passed each other, words were exchanged, and an argument ensued.

36.    Although the two groups argued, the confrontation was limited to words. Suddenly and without physical provocation, Vanecko punched Koschman square in the face, and did so with brutal force. Vanecko, who was 29 at the time, was 6' 3" and weighed 230 pounds, and according to witnesses had the build of a linebacker. Koschman, who was 21 years old, was 10 inches shorter and 105 pounds lighter than Vanecko, measuring 5' 5" and weighing 125 pounds.

37.    The blow was legally unjustified and constituted aggravated assault and aggravated battery under the criminal laws of the State of Illinois.

38.     Vanecko's blow was devastating. One witness described hearing a "snap" sound as the punch was landed. A bystander who was not with either group said that Koschman came flying out from among the arguing groups as if from an "explosion," and landed like a dead weight, apparently already unconscious. Vanecko's blow caused David Koschman's lip to swell and bleed, leaving blood on his teeth and lip, and in his mouth.

39.     Koschman's head struck the pavement, causing massive injuries. He suffered a fracture to the right back of the head, a separate fracture to the left back of the head, and a fracture on the left, inner side of the skull. Doctors would later determine that these injuries caused massive internal bleeding in Koschman's skull. Koschman fell back on the pavement, and would never regain consciousness.

40.     Vanecko then fled the scene with Denham. The McCarthys began walking away as well, but Koschman's friends flagged down a patrol officer, Edwin Tremore, who apprehended Kevin McCarthy, placed him in handcuffs, and seated him in his squad car.

41.     Officer Tremore questioned some of those present. Koschman's friends and a bystander told Tremore that Kevin McCarthy was not the person who punched Koschman, but rather that it was the larger of the two white men who had fled the scene. Kevin McCarty lied to Tremore, telling him that he did not know the identities of the persons who had fled. Tremore then released McCarthy, who left the scene with his wife and met Vanecko and Denham back at the Pepper Canister.

42.     Upon information and belief, sometime during or shortly after this meeting at the Pepper Canister, Vanecko informed Mayor Richard M. Daley, other as of yet unidentified members or associates of the Daley family, and/or unidentified senior members of Mayor

Daley's staff of the incident on Division Street. These persons are designated as Defendant John Does 4-6 in this complaint.

43.     Upon further information and belief, later that day on April 25, 2004, Mayor Daley and/or one or more persons who were members of the Daley family or otherwise closely connected to Mayor Daley or the Daley family (Defendant John Does 4-6) caused one or more high ranking officials within the Chicago Police Department to be notified of Vanecko's involvement in the incident. These as of yet unidentified officials are designated as Defendant John Does 1-3 in this complaint.

44.     Over the next few hours, Tremore contacted doctors at Northwestern University Hospital, where Vanecko's father was the head of Cardiology, and recorded their assessment that Koschman was being treated for head wounds and was in very serious condition. Tremore notified detectives in the Violent Crimes Section of Area 3 about the incident, and completed his report (and his involvement) in the case in the early morning hours of April 25.

### Initial Detective Division Investigation

45.     Later in the morning of April 25, Area 3 detectives Rita O'Leary and Robert Clemens were assigned to investigate the case, which was initially classified as a simple battery.

46.     O'Leary and Clemens commenced their investigation into the incident that morning, and did so in three steps. First, O'Leary and Clemens interviewed Kevin McCarthy about the previous night. (McCarthy, again lying, told the detectives he did not know who else was involved in the altercation, which O'Leary and Clemens believed was untrue.) Next, O'Leary contacted Michael Connolly, one of the bystander witnesses to the incident, and interviewed him about what he had seen. Finally, O'Leary contacted Plaintiff and learned that David Koschman was in a coma and in critical condition.

8

47.     Pursuant to standard CPD procedure, O'Leary and Clemens took notes during these investigative steps, recording them on General Progress Report forms, called "GPRs." Later in the day on April 25, 2004, O'Leary drafted a typewritten Supplementary Report recording the investigation to date.

48.     Sometime during the day on April 25, while the investigation by O'Leary and Clemens was underway, certain senior officers in Area 3, including Defendant Police Lieutenant Robert Rybicki and Defendant Area 3 Commander Michael Chasen, were informed that Vanecko had been involved in the incident, and that Vanecko was Mayor Daley's nephew. On information and belief, Mayor Daley and/or one or more persons who were members of the Daley family or otherwise closely connected to Mayor Daley or the Daley family (John Does 4-6) caused this information to be provided either to high ranking officials within the CPD (John Does 1-3) or directly to Defendants Rybicki and Chasen. The purpose of this contact was to influence the course of the investigation into the incident and to prevent Vanecko from being exposed to criminal or civil liability.

49.     The significance of Vanecko's relationship to Mayor Daley was not lost on either Chasen or Rybicki. Upon learning the information, one of them exclaimed, "holy crap, maybe the Mayor's nephew is involved."

50.     From the moment that CPD commanders learned of Vanecko's involvement in the incident and his relationship to Mayor Daley, the Chicago Police Department's handling of the case, as well as that of other agencies described more fully herein, became an official cover-up. CPD officials, including Defendants Chasen, Rybicki, and John Does 1-3, stopped the investigation in its tracks.

9

51.     Under the CPD's standard investigative procedures, detectives investigating any incident are to canvass the vicinity of the incident for witnesses and evidence. In this case that would have included the ample video surveillance recordings that existed in the area; there were at least 13 nearby establishments with video footage that could have provided evidence about the incident. In addition, during their investigation on April 25, O'Leary and Clemens had developed a list of witnesses to be interviewed.

52.     But neither O'Leary, nor Clemens, nor any other police officer took a single investigative step beyond the work described in the preceding paragraphs. A few hours after it began, the investigation ended on April 25.

### The Homicide Investigation

53.     On May 6, 2004, on medical advice, David Koschman was removed from life support and succumbed to his injuries. Hospital staff notified the CPD of Koschman's death the same day.

54.     On May 8, an autopsy was conducted as a result of which the Medical Examiner classified Koschman's death as a homicide.

55.     Now faced with a homicide, CPD officials, including defendants Chasen, Rybicki, and John Does 1-3, were forced to reopen the investigation of the assault. These officers, however, directed the investigation with the objective of creating a false record so as to insulate Vanecko from criminal or civil liability for his assault.

56.     In furtherance of this plan, these officials assigned a veteran Area 3 homicide detective, defendant Ronald Yawger, who was specifically informed that Daley's nephew was the alleged perpetrator, to lead the investigation.

57.     Yawger had a reputation for being a thorough investigator. But he, like O'Leary and Clemens before him, never undertook the basic step of canvassing the area where the crime had occurred and gathering evidence—particularly the ample video surveillance footage that was available in the area at the time. Instead, Yawger's efforts, and those of the detectives who worked the case with him, were focused on fabricating evidence that would allow Vanecko to avoid any culpability for his crime.

58.     Yawger and another detective, defendant Anthony Giralamo, conducted interviews with multiple witnesses who identified Vanecko as one of the persons who fled the scene, and as the aggressor in the encounter, who punched David Koschman without justification. The detectives covered up this evidence, and instead constructed a false official record. They did this in three ways.

59.     First, the detectives set about fabricating evidence that the attack on Koschman was a justified act of self-defense. Giralamo's GPR of his interview with bystander witness Philip Kohler, for instance, recorded that before being struck, Koschman had rushed forward into the center of the group and was "aggressive." But that was false—Kohler observed Koschman being *verbally* aggressive, not physically aggressive, and not as having his fists raised or otherwise appearing to be preparing to fight anyone in the other group. Giralamo's GPR deliberately made Koschman's "aggression" appear physical, however—a key distinction in determining whether Vanecko's actions were justified.

60.     Yawger's GPR of his interview with Scott Allen initially recorded that the largest member of Vanecko's group became very aggressive during the argument and threatened to attack Koschman and his friends. When it became clear that this evidence implicated Vanecko in Koschman's death, however, Yawger attempted to obliterate the evidence in the GPR by

scratching it out. This evidence against Vanecko was uncovered years later, during an investigation conducted by a court-appointed Special Prosecutor, with the help of an FBI forensics lab.

61.     Rita O'Leary took part in adjusting the story as well. On May 20, O'Leary "updated" her Supplementary Report to fit more closely the narrative being developed by Yawger and Giralamo. O'Leary's April 25 draft report of her interview with Connolly, which she recorded before she was aware of Vanecko's involvement, read as follows:

> CONNOLLY does see the victim get into the center of the altercation, *he does not know if the victim was a [sic] aggressor or peacemaker,* then he saw the victim get 'pushed or shoved' from the group and fall to the ground.

The italicized phrase indicated that Koschman's actions did not indicate an obvious aggressive intent—and, thus, that Vanecko's attack on Koschman was not justified. O'Leary's May 20 edit removed that passage, however, to make Connolly's witness statement consistent with a self-defense theory:

> CONNOLLY saw the victim get into the center of the altercation, and then he saw the victim get 'pushed or shoved' from the group and fall to the ground.

This was an inaccurate portrayal of what Connolly saw and reported to O'Leary.

62.     To complete this fabrication, in an act that was strictly prohibited by multiple police procedures, O'Leary, Clemens, or another Chicago police officer removed the GPR recording Connolly's statement from the investigative file. This preserved the false version of Connolly's witness statement as recorded in O'Leary's Supplementary Report, and prevented Connolly's actual statement, which was recorded by O'Leary before she learned of Vanecko's relationship to the Mayor, from becoming known.

63.     Though multiple witnesses had told Yawger and Giralamo that Koschman was not the aggressor and he had not been physically aggressive before Vanecko punched him,

Yawger fabricated such evidence in his final case report, stating that based upon "the interviews of all parties involved . . . David Koschman was clearly the aggressor in this incident." Yawger went further, reporting that "David Koschman[] was clearly the aggressor as corroborated by all of the witnesses interviewed, in that . . . Koschman continued to attack [Vanecko's group] . . . resulting in the victim either being pushed or punched in self-defense . . . ." Yawger's recording of these witness statements, as summarized in his report, was false, and was fabricated by Yawger and other officers involved in the investigation. Yawger fabricated this evidence against David Koschman in order insulate Vanecko from civil or criminal liability for his actions.

64.     Second, though the witnesses who actually saw the contact between Vanecko and Koschman uniformly told the police that Vanecko had punched Koschman, and not pushed him (and the medical evidence corroborated that fact), some witnesses who had not seen the moment of contact were not sure whether Koschman was pushed or punched. Yawger seized on this "ambiguity," and would eventually record in his case report that it was uncertain whether Koschman was pushed or punched. This was a further effort to cover up evidence that was inculpatory of Vanecko, and it was done as part of Yawger's effort to prevent Vanecko from being held liable for Koschman's death.

65.     Third, the detectives tried to conceal the fact that it was Vanecko who punched Koschman. Both Koschman's friends and the bystander witnesses were consistent in reporting that there were three males in Vanecko's group, and that it was the largest of the three who punched Koschman. They also stated that the male who threw the punch was not McCarthy, who had been detained at the scene. This left no doubt as to the identity of the assailant. Bridget McCarthy told Yawger that in addition to Kevin McCarthy, the other two males, who had fled, were Vanecko and Denham. Vanecko was 6' 3" and 230 pounds, Kevin McCarthy was 6'2" and

190 pounds, and Denham was 5'10" and 170 pounds. Vanecko was five inches taller and sixty pounds heavier than Denham, the other member of the group who fled. By process of elimination, Vanecko was the member of his group who threw the punch. Yawger has now recently admitted to the Special Prosecutor that, based on his original investigation, he knew Vanecko was the person who punched Koschman.

66. Nevertheless, on May 20, police detectives, led by Yawger (and as described below, Assistant State's Attorney Darren O'Brien), conducted police lineups in which Koschman's companions and bystander witnesses were asked to identify Vanecko, Kevin McCarthy, and Denham.

67. The defendants used the lineups to inject false confusion into the record. Although there was no doubt that Vanecko was the perpetrator, the incident had occurred in the space of a few minutes, at night, between inebriated strangers, nearly a month before the lineup took place. These were ideal conditions for a misidentification, as the police and prosecutor well knew. Mindful that witnesses had said that Vanecko was the largest member of the group, police scoured the stationhouse for white male "fillers" who were even larger than Vanecko. And police did not have the lineup participants wear hats, even though witnesses had said that the person who punched Koschman was wearing one. Not surprisingly, the witnesses were not able to identify Vanecko.

68. In a similar manner, lineups also were conducted for Denham and Kevin McCarthy—even though, as with Vanecko, there was no doubt about their roles in the incident. Faced with similar handicaps, the witnesses provided inconsistent identifications of Denham and McCarthy as well.

14

### Assistant State's Attorney O'Brien Becomes Involved in the Cover-Up

69.     On May 19, 2004, as Yawger was preparing to conduct the lineups, senior Area 3 commanders, including Chasen, instructed Yawger to contact the SAO's Felony Review Unit for an "advice" about whether to bring charges. The SAO then became involved in the scheme to insulate Vanecko from liability.

70.     Standard procedures between the CPD and the SAO provided that when the police request an "advice" from the SAO, they seek out a staff attorney from the SAO's Felony Review Unit. In the Koschman case, however, the prosecutor who responded was Darren O'Brien, Chief of the Felony Review Unit. For the Chief of Felony Review to respond to a request for consultation was highly unusual, and the Special Prosecutor's investigation has now established that O'Brien was contacted because the Mayor's nephew was involved.

71.     On May 20, following the police lineups, O'Brien, accompanied by Yawger, re-interviewed numerous witnesses to the case, including the McCarthys, Denham, and Koschman's friends. The witnesses in these interviews provided O'Brien and Yawger with ample evidence that Vanecko, and not Koschman, was the aggressor in the April 25 incident, making it clear that Vanecko was liable for Koschman's death. Additionally, according to the Special Prosecutor's Report, O'Brien, like O'Leary before him, concluded that the McCarthys were lying in their statements.

72.     But even though O'Brien and Yawger were both experienced in their jobs, with reputations for thorough, high-quality work, they both either failed to take meaningful notes in any of these interviews, or they did take such notes and thereafter destroyed them.

73.     Vanecko also appeared at Area 3 on May 20, 2004, together with his lawyer, Terrence Gillespie, a former assistant state's attorney under Richard M. Daley, who had been retained for Vanecko by the Mayor's brother, Michael Daley.

74.     Vanecko refused to give a statement concerning his involvement in the homicide of David Koschman, and thereby did not raise the defense of self-defense.

75.     Though "advice" assignments, by design, create an extensive paper trail within the SAO, O'Brien went to lengths, and violated several SAO procedures, to prevent such a trail from being created in the Koschman case. O'Brien never made a record in the Felony Review Unit's "PROMIS" case-tracking database—even though making such entries is a standard procedure that O'Brien rigorously enforced as chief of the Felony Review Unit. And even though ASAs are required to create a "felony review folder" for every "advice" case they review and then turn over the folder for recordkeeping, O'Brien never turned such a record in. Instead, he destroyed the Koschman folder and the evidence it contained. ASA O'Brien did these acts to obliterate evidence that inculpated Vanecko for Koschman's death.

76.     O'Brien, in order to protect Vanecko and the Daley family, then utilized the false and manufactured version of events—that the perpetrator acted in self- defense and that the identification of Vanecko was suspect—to make the pre-ordained decision not to prosecute Vanecko.

77.     At the same time, however, O'Brien made a point to report on the case to the SAO's most senior management, including the State's Attorney at the time, defendant Richard Devine. State's Attorney Devine—who had served as a First Assistant State's Attorney to then-State's Attorney Richard M. Daley and worked as an aide to Mayor Richard J. Daley—personally approved and/or ratified O'Brien's decision not to charge Vanecko, as did the CPD

defendants. Two days later, on May 22, an SAO spokesman, speaking on Devine's behalf, told the *Chicago Tribune* that the SAO had concluded that no charges should be filed in the case.

### Chicago Police Commanders Continue the Cover-Up

78.     After O'Brien's May 20 visit to Area 3, the CPD's efforts to cover up Vanecko's liability for the homicide continued. On May 25, 2004, defendant Phil Cline, Superintendent of the CPD, made a public statement that was widely reported in the media that presented a knowingly false version of events as a justification for not bringing charges, characterizing David Koschman and Vanecko as "mutual combatants," and further stating that there was "no basis for criminal charges based on the witness statements and all the evidence we have." Cline made his statements to the press, which he knew were not grounded in evidence uncovered in the police investigation, in furtherance of the official cover-up and to insulate Vanecko from liability.

79.     SAO press secretary John Gorman, speaking at the direction of Defendants Richard Devine and Darren O'Brien, made a similar public statement, adopting the reasons articulated by defendant Cline, and further stating that the CPD and the SAO agreed that no charges would be brought against defendant Vanecko.

### Meeting with Nanci Koschman

80.     In furtherance of the cover-up, Defendant Yawger lied directly to Plaintiff in a face-to-face meeting with Plaintiff in late May, 2004. At the meeting, Yawger directly communicated the false and fabricated version of events to Plaintiff, falsely telling her that all witnesses had told the CPD that her son was the aggressor during the incident. He further stated that the only person who could be charged was her son; that she was opposed by powerful forces; and that any attempt to litigate would be futile. These false statements not only caused

17

Plaintiff severe emotional distress, but were made to dissuade Plaintiff from pursuing civil litigation against Vanecko.

81.     At this meeting, Yawger refused to provide Plaintiff with a copy of the CPD's case file on the incident, which he had in his possession, saying that she would have to seek the file through a Freedom of Information Act ("FOIA") request. Yawger officially kept the Koschman investigation in an "open" status, however, knowing that doing so would provide grounds to deny any FOIA requests for the CPD's investigative case file on the incident. Yawger did this in a further effort to prevent Plaintiff from learning the true facts about her son's death. Indeed, the "open" designation was utilized by the CPD to deny an FOIA request made by the *Chicago Tribune* in late May of 2004.

82.     This "open" designation was inaccurate and in contravention of standard police procedures. On information and belief, Yawger inaccurately classified the file as "open" with the knowledge and approval of his Area 3 supervisors, including Defendants Rybicki and Chasen. It was thus that the Koschman case remained "open" despite multiple audit procedures within the CPD designed to alert police supervisors to the existence of open homicide investigations.

83.     In further contravention of standard practice, Yawger waited until November 2004 to complete his Supplementary Report. Yawger waited to submit his report in order to ensure that the fabricated version of the case could be reconciled (if necessary) with any additional evidence that might emerge implicating Vanecko in Koschman's death. For similar reasons, the Supplementary Report that O'Leary and Clemens had prepared on April 25 (and then altered on May 20), also was not approved until November 2004.

84.     The Supplementary Report that Yawger submitted in November 2004 fabricated witness statements to the effect that Koschman was the aggressor and that Vanecko (or whoever had struck Koschman) had acted in self-defense. Yawger fabricated these statements to create a false record and thereby to insulate Vanecko from both civil and criminal liability for killing David Koschman.

85.     Thereafter, although the Koschman homicide case technically remained open, the CPD conducted no further investigation into the case for seven years, until 2011.

### Investigation Re-Opens after *Sun-Times* FOIA Request

86.     On January 4, 2011, the *Chicago Sun-Times* filed a FOIA request for the CPD's files related to David Koschman's death. For months thereafter, this single FOIA request drew the sustained, focused attention of the highest levels of city government, including the CPD, the SAO, and the Office of the Mayor. A re-investigation was instituted, as well as a review by the SAO. The goal of this activity was not to uncover the truth about what had happened in April 2004, however. Rather, it was to ratify and to further the initial cover-up of Vanecko's crime, and to ensure that the story fabricated in 2004—that Koschman was the aggressor and deserved what he got—would withstand what city officials anticipated would be sustained scrutiny by investigative journalists.

### Police Response to January 2011 FOIA Request

87.     Purportedly astonished to learn that this 2004 investigation was classified as "open," then-CPD Superintendent defendant Jody Weis told his Chief of Staff, Michael Masters, to get the case resolved. The defendants' goal in "resolving" the case, however, was to close the case quickly, without bringing charges against Vanecko. Weis instructed defendant Chief of Detectives Tom Byrne to begin a re-investigation. In turn, Byrne enlisted Deputy Chief of

Detectives, defendant Dean Andrews, who enlisted Area 3 Commander, defendant Gary Yamashiroya, and Area 3 Lieutenant, defendant Denis Walsh, in the re-investigation.

88.    In furtherance of their ongoing effort to perpetuate the false official record and insulate Vanecko, Walsh and other police officers hid or destroyed parts of the CPD's files regarding the Koschman investigation. As described further below, these files—in altered form—only showed up months later after outside officials began examining the CPD's handling of the case.

89.    The same day that the *Sun-Times* issued a FOIA request to the CPD, Yawger, who had retired from the Department, called Area 3, where Walsh was assigned. On information and belief, Yawger called Area 3 to discuss the Koschman homicide file with Walsh. After purportedly searching for the file, defendant Walsh reported to defendant Yamashiroya that the Koschman homicide file was "missing." Defendant Yamashiroya then purportedly found an incomplete copy of the file in his own office. This file was missing numerous materials, including the General Progress Reports from the 2004 investigation.

90.    From even the partial file provided by Yamashiroya, however, it was evident, as defendant Andrews admitted to the Special Prosecutor, that Yawger's initial investigation contained gaping holes that the CPD would not be able to explain, particularly the "inability" to identify Vanecko as the person who punched Koschman. Andrews and Deputy CPD Superintendent, defendant Steven Peterson, therefore reassigned the investigation to the Area 5 Detective Division, where Andrews had previously worked as a Commander.

91.    Once the case was reassigned, Area 5's Commander, defendant Joseph Salemme, hand-picked the re-investigation team, which was comprised of defendant Sergeant Sam Cirone as supervisor and defendant detectives James Gilger and Nick Spanos as lead investigators.

20

92.     Salemme selected these officers because they could be trusted to protect Vanecko, and by extension, the careers of the other police officers involved in the case. Gilger had worked extensively with both Andrews and Salemme, and Andrews was personal friends with both Cirone and Gilger.

93.     Defendants Peterson, Byrne, Andrews, Yamashiroya, Salemme, Walsh, Cirone and Gilger were all familiar with the 2004 investigation and its obvious inadequacies. Nevertheless, knowing that Vanecko was the Mayor's nephew, all these defendants shared an intent and objective of conducting a quick and superficial investigation with a pre-determined result of closing the case without charges, and determined to do so at a meeting, on January 13, 2011, which they all attended.

94.     Consistent with this objective, detectives Gilger and Spanos began re-interviewing witnesses to the April 25 incident. In so doing, they methodically fabricated evidence against Koschman in order to further manufacture a self-defense case for Vanecko.

95.     On January 17, for example, Gilger interviewed James Copeland, one of Koschman's friends who witnessed the incident. Gilger recorded Copeland as stating that he was trying to pull Koschman back from Vanecko's group. That was a fabrication; Copeland would later testify he never told Gilger that anyone was trying to pull Koschman back from Vanecko's group. Gilger also recorded Copeland as saying that Koschman walked up to Vanecko's group, but this was a fabrication as well; in Copeland's recollection, both groups were in the same area, and Koschman was not moving toward Vanecko's group when he was punched.

96.     The same day, Gilger interviewed Scott Allen, another one of Koschman's friends who had been at the scene. Gilger recorded Allen as stating that Koschman was "yelling" and

was in the "thick" of the argument. Allen would later testify that Gilger's report was a fabrication that made Koschman appear to be more aggressive in the incident than was the case.

97.    On January 18, Gilger and Spanos interviewed David Francis, another of Koschman's friends at the scene. Gilger's GPR recorded Francis as saying that after all parties thought the dispute between the two groups was over, Koschman "went at this guy," implying that Koschman attacked Vanecko. Francis would later testify that this was false—Koschman had continued to talk to Vanecko's group, but he never physically "went after" Vanecko, or otherwise made any threatening moves towards Vanecko's group.

98.    Also on January 18, Gilger and Spanos interviewed bystander Philip Kohler. Gilger's GPR reported Kohler as stating that there was "pushing and shoving happening between the two groups." This was false—Kohler had said that the groups had been arguing, but that there was no physical contact between the groups until Vanecko assaulted Koschman.

99.    On January 19, Gilger and Spanos interviewed Michael Connolly, the other bystander witness, and again recorded a false version of events that was favorable to Vanecko. Gilger's GPR records Connolly as stating that that Koschman was "pushed" by someone in the group; Connolly would later explain, however, that his view was blocked and he had no way of determining whether what knocked Koschman down was a push or a punch.

100.    Gilger and Spanos took no evidence from McCarthys, Denham, or Vanecko. Thus the statements they heard—that Koschman in fact had done nothing to threaten Vanecko or his friends—were uncontradicted.

101.    In addition to fabricating evidence, the police conducting and overseeing Area 5's re-investigation permitted Yawger, who had been retired from the CPD since 2007, and Area 3 Lieutenant Denis Walsh to participate in the Area 5 re-investigation. During the course of the

investigation in 2011 and thereafter, Yawger and Walsh engaged in frequent communication about the case, while Walsh received updates from Area 5 detectives. These contacts had no investigative purpose other than to ensure that the version of events being fabricated in 2011 matched that fabricated by the CPD and the SAO in 2004.

102.   On January 18, five days after the re-investigation had been assigned to Gilger and Spanos and while the detectives were in the middle of their interviews, CPD Lieutenant and commander of Legal Affairs, defendant Maureen Biggane, contacted Mayor Daley's Office to assure personnel there that, as she had been told by Defendant CPD Chief of Detectives Byrne, the CPD would quickly close the Koschman case without bringing charges. Likewise, on February 9, Gilger emailed Walsh and informed him that he already knew that no charges would be brought against Vanecko—even though he had not submitted a case report for review by senior officers, and even though the CPD's eventual meeting about the case with the SAO was nearly a month away. As Biggane revealed in additional emails to City Hall on March 2 and 3, the primary objective of the CPD was to have a complete case file that was closed without charges to turn over to the *Sun-Times* in response to its FOIA request.

103.   On February 11, 2011, after conducting the witness interviews described above and having been informed that the McCarthys, Denham, and Vanecko would not cooperate with the investigation, defendants Gilger and Spanos drafted a report that cleared and closed the case without charges. The report identified Vanecko as the person who punched David Koschman, and made no mention of self-defense.

104.   On February 27, 2011, defendants Salemme, Andrews, Cirone, and Gilger, realizing that Gilger and Spanos's February 11 report did not sufficiently exonerate Vanecko, fabricated from whole cloth evidence to support a false self-defense claim. They did so by

adding to the report that witnesses had reported that Koschman "aggressively went after Vanecko stating 'fuck you, I'll kick your ass,'" and that "these aggressive actions caused Vanecko to take action to defend himself and his friends from being attacked."

105.    This evidence, which was designed to make Koschman appear as an aggressor and thereby justify Vanecko's assault, was entirely fabricated. After Cirone inserted the fabricated self-defense evidence in Gilger and Spanos' final report, Andrews complimented Cirone, telling him it was "very nicely done." Andrews and Salemme then directed that the report be immediately approved by an Area 5 Sergeant, which it was, on February 28, 2011.

106.    Also on February 28, 2011, CPD Deputy Superintendent, defendant Ernest Brown, told the *Chicago Sun-Times* that the CPD had conducted "a comprehensive review of the entire investigation as it stood," that this review "revealed that the facts of the [2004] investigation remained unchanged since it was initially investigated," and that the case would be "closed shortly." This deceptive statement was true only in the sense that witnesses had been consistent in telling police that Koschman was *not* the aggressor in the incident. Brown's statements to the press were thus deliberately misleading and false. The CPD closed the case on March 2.

### Involvement of the Mayor's Office

107.    Virtually from the moment the CPD received the FOIA request from the *Sun-Times* on January 4, the office of Mayor Daley was closely involved in the case. CPD personnel engaged in regular communication with Mayor's office, repeatedly assuring personnel there that the investigation would be closed quickly and that no charges would be filed against Vanecko.

108.    The Mayor's office was alerted to the *Sun-Times* FOIA request a matter of days after it was made, and officials there immediately expressed concern that the request might

implicate Vanecko. Then on January 18, 2011, five days after the January 13 meeting in which the case was re-assigned to Gilger and Spanos, CPD Lieutenant and commander of Legal Affairs, defendant Maureen Biggane, contacted Mayor Daley's Office, including Rosa Escanero and Jodi Kawada, and press secretary Jackie Heard, and assured them that the CPD would quickly close the Koschman case without charges. Biggane made these assurances after being so informed by Defendant CPD Chief of Detectives Byrne. The same day, Escanero responded that she was confident that when CPD responded to the request, all names would be redacted from the report. (This meant that Escanero knew the outcome of the re-investigation in advance, since the CPD would only be required to provide a substantive response to the FOIA request if no charges were brought against Vanecko.)

109.    The Mayor's Press office also controlled the CPD's statements to the *Sun-Times* regarding the FOIA request, and insisted that Mayoral personnel review all FOIA responses before they were sent. Throughout, Biggane continued to update the Mayor's office on progress in the case, informing staffers of when CPD planned to close the investigation, advising them in advance of when CPD and SAO would meet regarding the case, and informing the Mayor's office of the contents of CPD's and SAO's discussions.

### Involvement of the State Attorney's Office

110.    Even though it had no official role in the CPD's decision in January 2011 to re-investigate the Koschman homicide, the SAO was involved in and closely monitored the case. SAO personnel, including senior management, including, but not limited to, defendant State's Attorney Anita Alvarez and her Chief of Staff, defendant Daniel Kirk, also approached the re-investigation with the intention not that the truth should be found out, but that that Vanecko should avoid prosecution.

111.    Nearly from the outset, the SAO was "looped in" regarding the progress of the
CPD's re-investigation, and received police reports as the re-investigation progressed.  On
January 21, shortly after the re-investigation opened, Gilger contacted O'Brien regarding the
case, and O'Brien provided Gilger with O'Brien's false and manufactured conclusion that
Vanecko acted in self-defense.  A few weeks later, on February 9, Gilger reported to Walsh that
the SAO's Felony Review Unit was already involved in the case, and that Gilger knew that the
Felony Review would reject charges against Vanecko if it was formally asked for an assessment.

112.    From late January onward, defendant Alvarez and her staff, including defendant
Kirk and co-conspirator Sally Daly, gathered "the facts" concerning the investigation and
debriefed defendant O'Brien about the case.

113.    During the course of the re-investigation, defendant Alvarez and the SAO
continued to make knowingly false statements to the press that furthered the fabricated account
that Vanecko's assault was justified.  On February 23, Alvarez caused a false statement to be
released to the *Chicago Sun-Times* asserting that "all witnesses who were questioned [during the
2004 investigation] indicated that Koschman was the aggressor and had initiated the physical
confrontation by charging at [Vanecko's group] after they were walking away."

114.    Despite Gilger's contact with O'Brien and the involvement of the Felony Review
Unit in the investigation, Alvarez's February 23 statement also falsely told the *Sun-Times* that
the SAO had received no inquiries about the case from the CPD since 2004, that no witnesses
had come forward with different accounts of the 2004 incident, and that from the SAO's
perspective the case had been entirely dormant since that time.

115.    As the CPD re-investigation wound down, Alvarez and the SAO determined—
even before looking at the re-investigation's results—that they would not seek charges in the

26

case. Early on March 3, on instructions from defendants Alvarez and Kirk, defendant O'Brien furthered the false narrative against David Koschman, telling the *Chicago Sun-Times* that he could not identify who pushed or shoved David Koschman, and that all witnesses *had* told him that Koschman was the "aggressor" in the incident.

116.    O'Brien knew these statements to be false.  Alvarez and Kirk had approved O'Brien's making the statements, even before they received the CPD's homicide file, in order to further shield Vanecko from criminal and civil liability and to anticipate any efforts to raise doubts about the CPD and SAO inquiries into the matter.

117.    On the same day the *Sun-Times* article appeared, Alvarez, Kirk, Daly, Peterson, Biggane, Byrne, and several other high-level CPD and SAO officials met at the SAO's downtown office and discussed the Vanecko case.  The meeting lasted only 15 to 20 minutes, but in that short time the SAO agreed that the case would not be prosecuted.  As Biggane reported on the meeting to the Mayor's Office, "We [CPD] and CCSAO remain in concurrence.  Therefore, the file is to be released [in response to the *Sun-Times* FOIA request] tomorrow."

118.    On March 19, 2011, Alvarez told the *Sun-Times* that "at this time we are unaware of any new evidence that would enable us to bring charges, and therefore we could not bring the case to the grand jury."  This statement was false.

119.    In a subsequent interview on March 24, 2011 Alvarez continued to advance the false official record, saying that the SAO did not "believe we have a good faith and legal basis to bring charges," and that it would be "unethical" for her office to do so.

120.    Nonetheless, in a ploy to make it appear that the record was transparent, Alvarez appeared to concede that there should be an "independent" police investigation of the assault by the Illinois State Police (ISP).  Alvarez knew, however, that the ISP had a clear conflict of

interest. Its recently appointed Director, Hiram Grau, had been the CPD Deputy Superintendent who oversaw the detective division at the time of the Koschman homicide, and, in 2011, was Deputy Chief of the Cook County State's Attorneys' Investigations Bureau. In April of 2011, the ISP predictably declined defendant Alvarez's request to investigate because of this obvious conflict. Although Alvarez made it appear that she was seeking independent review, she, in fact, had no intention of allowing any such review to occur.

121.     To that end, on March 30, 2011, Alvarez caused defendant Kirk to block the attempt of Cook County Inspector General Pat Blanchard to initiate an investigation of the SAO's handling of the Koschman case.

### Reappearance of the Missing Files

122.     After the CPD closed the case in early March 2011, the City of Chicago's Inspector General Office ("IGO"), launched an investigation of CPD's handling of the Koschman homicide investigation, and began preparing to search the CPD for documents related to the case. In mid-April 2011, IGO sent a document request to the CPD for investigative documents relating to the Koschman investigation.

123.     This prompted defendant Walsh to communicate several times with Yawger, who had retired from the department years before. On June 28, Walsh and Yawger had an extended telephone conversation. The next day, on June 29, Walsh "found," purportedly in the presence of Area 3 Sergeant, defendant Thomas Flaherty, a copy of what appeared to be an altered version of the Area 3 Koschman homicide file. Walsh then purportedly took the file home and kept it there for more than two weeks. The very next day, on June 30, Yawger visited Area 3 and "found" his Koschman working file, purportedly in the Area 3 locker room, months after the CPD closed its re-investigation.

124.    These files, after remaining in the control of Walsh and Yawger, were eventually turned over to the IGO. The Koschman file documents were not in the same binders that they had been seen in earlier, however, and the documents within them did not match the Inventory Sheets—suggesting that materials in the folders had been removed and re-arranged.

125.    Defendant Clemens told the Special Prosecutor's investigation that he saw defendant Walsh in possession of yet another Koschman file sometime in the spring of 2011, and this file has not been located to this day.

126.    On information and belief, Walsh, Yawger, and possibly other officers, including defendants Yamashiroya and Flaherty, destroyed evidence in these files that contradicted the CPD's fabricated evidence inculpating Koschman as the aggressor in the April 2004 incident, and, in the case of the Clemens file, hid or destroyed the file itself.

127.    On July 20, 2011 defendant Walsh, upon the instruction of a superior officer, filed an Internal Affairs Division (IAD) complaint concerning the "found" homicide file.

128.    IAD Sergeant, defendant Richard Downs, conducted the IAD "found file" investigation. This "investigation" was not designed to determine how the missing file had been "found," however. Rather, it was done to create the appearance that an investigation had been conducted. Downs's entire inquiry consisted of a ten minute interview of Walsh, who did not fully cooperate and withheld the purported fact that defendant Flaherty was present when he claimed to have discovered the homicide file.

129.    The day after Walsh's interview, Downs entered a finding of "not sustained." The CPD did not conduct any further investigation of the missing and altered files.

### The Special Prosecutor's Investigation

130.    In December 2011, Plaintiff petitioned the Circuit Court of Cook County to appoint a Special Prosecutor to investigate David Koschman's homicide and a possible cover-up by the CPD and the SAO.

131.    Defendant Alvarez vigorously opposed Plaintiff's petition, falsely contending that the SAO was actively investigating the homicide and insisting that (notwithstanding the claimed ongoing investigation) any prospect of future criminal prosecution of Vanecko was "dim."

132.    In April of 2012, over Alvarez's objections, Cook County Circuit Court Judge Michael Toomin appointed Chicago attorney Dan Webb as Special Prosecutor.

133.    After the appointment, the SAO continued to undermine the investigation. Directly after the appointment, for example, defendant Kirk falsely stated to the *Chicago Tribune* that "there was no admissible evidence that could have been used to file charges."

134.    On December 3, 2012, less than eight months after receiving the assignment, Special Prosecutor Webb caused Vanecko to be indicted for involuntary manslaughter. The indictment alleged that Vanecko, "without lawful justification," had recklessly used physical force to cause David Koschman's death. Upon this announcement, defendant Alvarez falsely stated that the SAO's own grand jury had been looking into the case "for almost close to a year."

135.    In September of 2013 Special Prosecutor Webb filed under seal a 162 page investigative report regarding official misconduct in the handling of the Koschman case.

136.    During his investigation, the Special Prosecutor took statements and testimony from the defendants herein, some under grants of limited immunity. Upon information and belief, many of the defendants gave false, misleading, and incomplete statements, as did numerous witnesses, including former Mayor Daley and certain of his family members, friends

30

and associates. This false and misleading information was provided in a continuing attempt to conceal the official cover-up described herein.

137.    On January 31, 2014, defendant Vanecko pled guilty to involuntary manslaughter, and on February 4, 2014 Special Prosecutor Webb publicly released his previously sealed investigative report.

138.    The indictment of Vanecko was an official repudiation of the CPD/SAO investigation and exoneration of Vanecko. The report described in detail the manner in which the CPD and SAO Defendants named herein had fabricated evidence and created a false official record in order to shield Vanecko from civil and criminal liability.

139.    Plaintiff has prepared this complaint based upon the indictment of Vanecko and using information revealed for the first time in the Webb report. Without the benefit of the indictment and the report, Plaintiff lacked a sufficient factual basis for the claims alleged in this complaint.

### 42 U.S.C. § 1983 Conspiracy Allegations

140.    All of the actions of the CPD, SAO and Defendant John Does 4-6, and their named and unnamed co-conspirators, as set forth above, including manufacturing, altering, suppressing and otherwise fabricating false and misleading evidence, making false public statements about the David Koschman case, deciding, in 2004 and again in 2011 not to charge and prosecute Vanecko, conducting sham investigations, exercising undue influence over the investigations and the decisions made therein, destroying and altering evidence that inculpated Vanecko, and giving false and incomplete statements and testimony in official reports, to investigators, and before the special grand jury were done jointly, in concert, and with the shared

intent of injuring Plaintiff and violating her Constitutional rights, particularly her right to access to the courts, and thereby constituted a continuing civil conspiracy under 42 U.S.C. § 1983.

### The Effect of the Defendants' Actions on Plaintiff and her Son

141.    As a result of Vanecko's actions, David Koschman suffered severe physical and mental pain, suffering and anguish, two surgeries, and, after 12 days in an induced coma, ultimately the loss of his life.

142.    As a further result of Vanecko's actions, Plaintiff was forced to watch helplessly while her son, his head badly misshapen, lay in a coma for 12 days, during which time he was subjected to two surgeries.  Ultimately, she had to make the unspeakably painful decision to follow medical advice and remove life support, thereby ending her son's life.  Plaintiff, recently widowed, lost her only son, who was college educated, who gave her great joy, love, and companionship, and, if he had lived, would have given her continued love, companionship, and financial contribution.

143.    Additionally, Plaintiff had to endure a sustained campaign of false and slanderous statements about her son, including defendant Yawger's face-to-face slander, and continuing thereafter, until Vanecko's guilty plea and the release of the Special Prosecutor's Report.

144.    If the Defendants had not created a false official record of the Koschman homicide, had not fabricated evidence against David Koschman, had not covered up and concealed the fact that Vanecko was legally responsible and directly at fault in that homicide, and not privately and publicly made false official pronouncements legally absolving Vanecko for her son's death, then Plaintiff would have filed a civil action *inter alia*, for battery and wrongful death against Vanecko.  If this cover-up had not occurred then, as in fact transpired many years later, Vanecko would have been charged for David Koschman's homicide and would have either

conceded that he was criminally liable for David Koschman's death and pled guilty or would have been convicted by a judge or jury. As a result of such a conviction, Plaintiff would have been entitled to summary judgment against Vanecko in a civil lawsuit for battery and wrongful death.

145.    The actions of all of the Defendants and their named and unnamed co-conspirators deprived Plaintiff of her right to timely pursue such a civil action, *inter alia*, for battery and wrongful death against Vanecko in the courts.

**Count I**
**(42 U.S.C. § 1983 – Deprivation of Right of Access to the Courts)**

146.    Each paragraph of this Complaint is incorporated herein.

147.    The CPD, SAO, and John Doe defendants named in this complaint, individually, jointly, and in conspiracy among themselves and with their named and unnamed co-conspirators, covered up defendant Richard J. Vanecko's criminal and civil culpability in the killing of David Koschman. As described more fully above, they did this, *inter alia*, by manufacturing, altering, suppressing and otherwise fabricating false and misleading evidence that portrayed David Koschman as the aggressor in what was actually a wanton and willful attack by defendant Vanecko, by making numerous false official public statements about the David Koschman case, by declining to charge and prosecute defendant Vanecko in 2004 and again in 2011, by conducting sham investigations, by exercising undue influence over the investigations and the decisions made therein, by destroying and altering official files and documents that inculpated Vanecko, and by giving false and incomplete statements and/or testimony to investigators, before the special grand jury, and in official reports.

148.    This official cover-up was rooted in a concerted and unremitting abuse of power and authority, and it was undertaken, *inter alia*, with the intent or knowledge that it would

33

obstruct the legitimate efforts of Plaintiff to vindicate David Koschman's killing through judicial redress, or with reckless disregard for same. In so doing, said Defendants violated Plaintiff's right of access to the courts, in violation of Plaintiff's rights under the First, Fifth, and Fourteenth Amendments to the Constitution of the United States.

149. Should the Court conclude that Plaintiff's claims against Defendant Vanecko in Counts III and IV of this Complaint are time-barred, then, as a direct and proximate result of the violations of the Defendants named in this Count, Plaintiff's right of access to the courts for the purpose of seeking redress against Vanecko and others has been denied and deprived.

WHEREFORE Plaintiff Nanci Koschman demands judgment against all of the defendants designated in this Count, jointly and severally, for substantial compensatory damages in an amount that will adequately compensate Plaintiff for all of the damages she has sustained, including damages she would have received in a battery and wrongful death action against Vanecko, as well as for attorneys' fees, and such other relief as this Court deems equitable and just. Further, since the acts of the Defendants were willful, wanton, and/or malicious, Plaintiff Nanci Koschman demands substantial punitive damages.

### Count II
**(42 U.S.C. § 1983 *Monell* Policy Claim against City of Chicago)**

150. Each paragraph of this Complaint is incorporated herein.

151. The actions of the Defendants and their co-conspirators, as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

152. At all times material to this complaint, Defendant City of Chicago, by and through its Police Department, Police Superintendents, Police Board, Mayors, City Council

and/or the Corporation Counsel's Office, had the following interrelated *de facto* policies, practices, and customs, among others:

    a.    failing to properly investigate, charge and prosecute, and otherwise engaging in acts of cover-up, concealment, suppression and alteration of evidence, and public disinformation in order to protect the Daley family political dynasty and to ensure that members of the Daley family are, to the fullest possible extent, insulated from criminal prosecution, civil liability, and personal and political embarrassment;

    b.    covering up, suppressing, and withholding relevant evidence, including specifically in secret "Area," "street," "working," "unit," "running," or other files which were kept at Areas 3 and 5 and other police Areas. This policy, practice and custom was specifically admitted to by police officials and found to exist at CPD Area 2 and at the other police Areas by a federal court jury and the Seventh Circuit Court of Appeals in the case of *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)

    c.    manufacturing and fabricating false witness statements;

    d.    filing false reports, and giving false statements and testimony and otherwise covering up the true facts in criminal cases;

    e.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers who are accused of misconduct, including, but not limited to, defendant Walsh;

    f.    perpetuating, encouraging and condoning the police code of silence, whereby police officers refuse to report or otherwise cover-up instances of

police misconduct, and/or fabricate, suppress and destroy evidence of which they are aware, despite their obligation under the law and police regulations to report. This code of silence causes police officers either to remain silent or to give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, and/or criminal charges;

g.   refusing to properly investigate, arrest and charge individuals whom the Police favor, including, in addition to members of the Daley family, fellow Police officers. (The failure of the CPD to investigate or charge Jon Burge or any of his subordinates for their many acts of torture and abuse, and the initial failure to charge Anthony Abbate for his battery of a female bartender, are examples of this *de facto* policy in operation.)

153.   The interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged the construction and fabrication of statements and other false witness evidence, the suppression, alteration, and destruction of evidence, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, the maintaining of secret files; and the destruction of files, and were, separately and together, a direct and proximate cause of, and moving force behind, the unconstitutional acts committed by the CPD Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

154.     Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above by final Chicago governmental and police policymakers, including, but not limited to, Mayor Richard M. Daley, Police Superintendents Cline and Weis, and their direct subordinates, including, but not limited to, defendants Brown, Peterson, Byrne and Andrews, establish that the constitutional violations alleged in this complaint were directly and proximately caused by the City of Chicago and the CPD.

WHEREFORE, Plaintiff Nanci Koschman demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

### Count III
### (Illinois Wrongful Death Act, 740 ILCS 180/1 –Vanecko)

155.     Each paragraph of this Complaint is incorporated herein.

156.     Plaintiff alleges this Count in the alternative to Counts I and II.

157.     Plaintiff Nanci Koschman is the appointed personal representative of the estate of decedent David Koschman.

158.     The wrongful death of David Koschman was proximately caused by the wrongful conduct of Defendant Richard J. Vanecko. As set forth more fully above, on April 25, 2004, on Division Street in the Old Town neighborhood in Chicago, IL, Richard Vanecko viciously assaulted and battered David Koschman in violation of 740 ILCS 180/1 *et seq.* by punching him square in the face and causing him to fall backward and hit his head on the pavement.

159.     As a direct and proximate result of Richard Vanecko's unjustified and wrongful conduct, David Koschman suffered severe injuries both internally and externally, and died of his injuries on May 6, 2004.

160.     David Koschman left Plaintiff, his mother, as his only next of kin.

161.    At the time of the occurrence, Plaintiff was in the exercise of due care for the safety of David Koschman.

162.    Because of David Koschman's death, Plaintiff, as next of kin, has lost and will continue to lose pecuniary support, protection, care, assistance, society, companionship, comfort, service, and love and affection of decedent David Koschman. Also as a result of David Koschman's death, Plaintiff, as next of kin, has suffered and will continue to suffer the mental anguish caused by this loss of pecuniary support, protection, care, assistance, society, companionship, comfort, service, and love and affection of her only and cherished son.

WHEREFORE, Plaintiff Nanci Koschman, as personal representative of the estate of David Koschman, deceased, demands judgment against defendant Richard J. Vanecko pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, for a sum that will adequately compensate Plaintiff for the damages sustained, punitive damages, the cost of this action, and any other relief the Court may deem appropriate. Additionally because defendant Vanecko acted willfully, wantonly, and maliciously, Plaintiff further seeks an award of substantial punitive damages from Defendant Vanecko.

### Count IV
### (Illinois Survival Statute, 755 ILCS 5/27-6 – Vanecko)

163.    Each paragraph of this Complaint is incorporated herein.

164.    Plaintiff alleges this Count in the alternative to Counts I and II.

165.    Plaintiff is the appointed personal representative of the estate of decedent David Koschman.

166.    As a direct and proximate result of Richard Vanecko's wrongful conduct, described more fully herein, David Koschman suffered severe injuries both internally and externally, for which he was hospitalized and placed under medical care for a period of 12 days,

38

from the date of Richard Vanecko's wrongful conduct on April 25, 2004, until the date of his death on May 6, 2004. During this period decedent David Koschman suffered great physical pain and mental anguish, was subjected to two surgeries, and was totally disabled. Further, substantial hospital and medical expenses were incurred because of decedent David Koschman's injuries and resulting death.

WHEREFORE, Plaintiff Nanci Koschman, as personal representative of the estate of decedent David Koschman, demands judgment against defendant Richard J. Vanecko pursuant to the Illinois Survival Statute, 755 ILCS 5/27-6, for a sum that will adequately compensate Plaintiff for the damages sustained, the cost of this action, and any other relief the Court may deem appropriate. Additionally because defendant Vanecko acted willfully, wantonly, and maliciously, Plaintiff further seeks an award of substantial punitive damages from Defendant Vanecko.

### Count V
**(State Law – Intentional Infliction of Emotional Distress – Vanecko)**

167.    Each Paragraph of this Complaint is incorporated herein.

168.    Plaintiff alleges this Count in the alternative to Counts I and II.

169.    As described more fully above, defendant Richard J. Vanecko assaulted and battered David Koschman by punching him squarely in the face, causing him to fall backward and hit his head on the pavement. This conduct was extreme, outrageous, unlawful, willful, wanton, malicious, and reckless.

170.    Defendant Richard J. Vanecko undertook this extreme and outrageous conduct with intent and/or knowledge that the conduct was extremely likely to inflict severe emotional distress on Plaintiff.

39

171.    As a direct and proximate result of Defendant Richard J. Vanecko's extreme and outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including but not limited to sleep disruption, anxiety, and depression and additional physical and psychological injury and illness.

WHEREFORE, Plaintiff Nanci Koschman demands judgment against defendant Richard J. Vanecko, for compensatory damages, the cost of this action, and any other relief the Court may deem appropriate. Additionally because defendant Vanecko acted willfully, wantonly, and maliciously, Plaintiff further seeks an award of substantial punitive damages from Defendant Vanecko.

### Count VI
### (State Law – Intentional Infliction of Emotional Distress)

172.    Each paragraph of this Complaint is incorporated herein.

173.    Each and every CPD, SAO and John Doe defendant named in this Complaint, individually, jointly, and in conspiracy, engaged in extreme and outrageous conduct by covering up defendant Richard Vanecko's culpability in the killing of David Koschman. As described more fully above, they did this, *inter alia*, by manufacturing, altering, suppressing and otherwise fabricating false and misleading evidence that portrayed David Koschman as the aggressor in the wanton and willful attack by defendant Vanecko, by making numerous false public statements about the David Koschman case, by deciding not to charge and prosecute defendant Vanecko and his companions in 2004 and again in 2011, by exercising undue influence over the investigations and the decisions made therein, by conducting sham investigations, by removing and destroying evidence that inculpated Vanecko, and by giving false and incomplete statements and/or testimony to investigators, before the special grand jury, and in official reports.

40

174.    Each and every Defendant named in this complaint engaged in this extreme and outrageous conduct with the intent to cause Plaintiff severe emotional distress, or so acted when they knew, or should have known, that their conduct would cause or be likely to cause Plaintiff severe emotional distress.

175.    As a direct and proximate result this conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including but not limited to sleep disruption, anxiety, depression and other psychological and physical injury and illness.

WHEREFORE, Plaintiff Nanci Koschman demands judgment against each and every Defendant named in this count, jointly and severally, for compensatory damages, the cost of this action, and for any other relief the Court may deem appropriate. Additionally, because each and every Defendant acted willfully, wantonly and/or maliciously, Plaintiff further demands substantial punitive damages from each and every such Defendant.

<u>Count VII</u>
**(State Law – Conspiracy to Inflict Severe Emotional Distress)**

176.    Each paragraph of this Complaint is incorporated herein.

177.    Each and every CPD, SAO and John Doe defendant named in this complaint, with each other and with other non-defendant co-conspirators, including those named in this complaint, together reached an understanding, engaged in a common venture, and otherwise jointly acted and/or conspired among themselves to engage in extreme and outrageous conduct by covering up defendant Richard J. Vanecko's culpability in the killing of David Koschman. As described more fully above, they did this, *inter alia*, by manufacturing, altering, suppressing and otherwise fabricating false and misleading evidence that portrayed David Koschman as the aggressor in the wanton and willful attack by defendant Vanecko, by making numerous false public statements about the David Koschman case, by deciding not to charge and prosecute

defendant Vanecko and his companions in 2004 and again in 2011, by exercising undue influence over the investigations and the decisions made therein, by conducting sham investigations, by removing and destroying evidence that inculpated Vanecko, and by giving false and incomplete statements and/or testimony to investigators, before the special grand jury, and in official reports.

178.    This extreme and outrageous conspiratorial conduct was with the intent, and/or had the effect of, directly and proximately causing Plaintiff severe emotional distress, and each and every Defendant knew, or should have known, that their conduct would cause or be likely to cause Plaintiff severe emotional distress.

179.    As a direct and proximate result this conspiracy, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including but not limited to sleep disruption, anxiety, and depression and other physical and psychological injury and illness.

WHEREFORE, Plaintiff Nanci Koschman demands judgment against each and every Defendant named in this Count, jointly and severally, for compensatory damages, the cost of this action, and for any other relief the Court may deem appropriate. Additionally, because each and every Defendant acted willfully, wantonly and/or maliciously, Plaintiff further demands substantial punitive damages from each and every such Defendant.

### Count VIII
### (State Law – Respondeat Superior)

180.    Each paragraph of this Complaint is incorporated herein.

181.    All of the Chicago Police Defendants were, at all times material to this complaint, employees of defendant City of Chicago, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the City of Chicago under state law pursuant to *respondeat superior*.

42

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims against the Chicago Police defendants, plus the costs of this action and whatever additional relief this Court deems equitable and just.

**Count IX**
**(745 ILCS § 10/9-102 Claim Against the City)**

182.     Each paragraph of this Complaint is incorporated herein.

183.     Defendant City of Chicago was the employer of each and every Chicago Police defendant at all times relevant and material to this complaint.

184.     Said defendants committed the acts alleged herein under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against defendants the City of Chicago in the amounts awarded to Plaintiff against the individual police Defendants as compensatory damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**NANCI KOSCHMAN**


By:  Locke E. Bowman
    One of her attorneys

By:  G. Flint Taylor
    One of her attorneys

Locke E. Bowman
Alexa Van Brunt
Stephen H. Weil
Roderick and Solange MacArthur
    Justice Center
Northwestern University School of Law
375 East Chicago Ave.
Chicago, Illinois 60611
(312) 503 -0844

G. Flint Taylor
People's Law Office
1180 North Milwaukee Ave.
Chicago, Illinois 60642
(773) 235-0070