**FILED**

7/15/2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NANCI KOSCHMAN, Individually and on behalf of the Estate of David Koschman, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-02041 |
| | ) | |
| CITY OF CHICAGO, *et al*., | ) | The Hon. Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN
OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS**

Locke E. Bowman
Alexa Van Brunt
Stephen H. Weil
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

G. Flint Taylor
People's Law Office
1180 North Milwaukee Avenue
Chicago, Illinois 60642
(773) 235-0070

## **TABLE OF CONTENTS**

INTRODUCTION: THE FACTS ALLEGED IN PLAINTIFF'S COMPLAINT ......................1

ARGUMENT ..............................................................................................................10

I.    COUNT I OF THE COMPLAINT STATES A CLAIM FOR DENIAL
OF ACCESS TO THE COURTS .......................................................................12

    A.  Count I Sufficiently Alleges that Mrs. Koschman Was Deprived of
Access to the Courts As a Result of the Defendants' Cover-Up of the
Truth about David's Homicide ...................................................................17

    B.  Mrs. Koschman's Denial-of-Access Claim is Timely ..................................21

II.   COUNTS VI AND VII OF THE COMPLAINT STATE A CLAIM
FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ...............27

    A.  Counts VI and VII Sufficiently Plead that the Defendants, Acting in
Concert, Caused Mrs. Koschman to Suffer Severe Emotional Distress ......27

    B.  The Intentional Infliction of Emotional Distress Claim
in Counts VI and VII is Timely ...................................................................29

III.  THE COMPLAINT SUFFICIENTLY ALLEGES A CONSPIRACY
AMONG THE DEFENDANTS ..........................................................................31

    A.  The Complaint Contains Sufficient Allegations Regarding
the Conspiracy to Satisfy the Pleading Requirements ..................................31

    B.  Each Co-conspirator Is Liable for the Misconduct of the
Other Conspirators In Furtherance of the Conspiracy ..................................35

IV.  THE PROSECUTOR DEFENDANTS ARE NOT ENTITLED TO PROSECUTORIAL
IMMUNITY OR EXECUTIVE PRIVILEGE ON THE DENIAL-OF-ACCESS CLAIM.36

        A.  O'Brien and Devine's 2004 Conduct Is Beyond the Reach
Of Prosecutorial Immunity ...................................................................37

i

B. The SAO Defendants Are Not Entitled to Prosecutorial Immunity
For Their False Public Statements ........................................................37

C. The SAO Defendants' Motion to Dismiss the Complaint's State
Law Claims on the Basis of "Executive Privilege" Must be Denied...................38

V.  NONE  OF THE INDIVIDUAL DEFENDANTS IS ENTITLED
TO QUALIFIED IMMUNITY ................................................40

VI.  COOK COUNTY IS A NECESSARY PARTY FOR PURPOSES
OF INDEMNIFICATION ................................................41

VII.  THE CLAIMS AGAINST VANECKO SHOULD NOT BE DISMISSED
WITH PREJUDICE ................................................42

CONCLUSION ................................................43

# TABLE OF AUTHORITIES

**Cases**

*Adcock v. Brakegate, Ltd.*,
    645 N.E.2d 888 (Ill. 1994) .................................................................... 29, 32, 36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 10, 11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................... 11

*Bell v. City of Milwaukee*,
    746 F.2d 1205 (7th Cir. 1984) ................................................................ 11-31, 40

*Bill Johnson's Restaurants, Inc. v. NLRB*,
    461 U.S. 731 (1983) .......................................................................................12

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*,
    291 F.3d 1000 (7th Cir. 2002) ........................................................................ 11

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993) ............................................................................. 37, 38, 39

*Burns v. Reed*,
    500 U.S. 478 (1991) ...................................................................................... 37

*Cannon v. Burge*,
    ___ F.3d ___, 2014 No. 12-1529 WL 2185016 (7th Cir. May 27, 2014) ................... 12, 21, 20

*Carver v. Sheriff of La Salle County*,
    787 N.E.2d 127 (Ill. 2003) ............................................................................. 41

*Christopher v. Harbury*,
    536 U.S. 403 (2002) ........................................................................... 12, 16, 40

*Feltmeier v. Feltmeier*,
    798 N.E.2d 75 (Ill. 2003) ......................................................................... 28, 30

*Garagher v. Marzullo*,
    478 F. Supp. 2d 1008 (N.D. Ill. 2006) ............................................................. 36

*Hill v. City of Chicago*,
    2009 WL 174994 (N.D. Ill. Jan. 26, 2009) ....................................................... 37

*Hoffman-LaRoche v. Greenberg*,
   447 F. 2d 872 (7th Cir. 1971) ................................................................. 35

*Jacobson v. Nat'l R.R. Passenger Corp.*,
   No. 97 C 6012, 1999 WL 1101299 (N.D. Ill. Nov. 29, 1999) ................................ 12

*Jones v. City of Chicago,*
   856 F.2d 985 (7th Cir. 1988) ................................................................. 36

*Lanza v. City of Chicago*,
   No. 08 C 5103, 2009 WL 1543680 (N.D. Ill. June 2, 2009) ................................. 30

*Loubser v. Thacker*,
   440 F.3d 439 (7th Cir. 2006) ......................................................... 31, 32, 33

*May v. Sheahan*,
   226 F.3d 876 (7th Cir. 2000) ................................................................. 13

*McClure v. Owens Corning Fiberglas Corp.*,
   720 N.E.2d 242 (Ill. 1999) .................................................................... 32

*National Cas. Co. v. McFatridge*,
   604 F.3d 335 (7th Cir. 2010) ................................................................. 41

*Orange v. Burge*,
   451 F. Supp. 2d 957 (N.D. Ill. 2006) ..................................................... 20, 37

*Patterson v. Burge*,
   328 F. Supp. 2d 878 (N.D. Ill. 2004) ................................................... 32, 38, 39

*Pierce* v. Pawelski,
   No. 98 C 3337, WL 184778 (N.D. Ill. Dec. 14, 2000) ...................................... 30

*Quinones v. Szorc*,
   771 F.2d 289 (7th Cir. 1985) ................................................................. 32

*Rivera*, 974 F. Supp. 2d at 1196 ..................................................... 38, 39

*Robinson v. Sappington*,
   351 F.3d 317 (7th Cir. 2003) ................................................................. 41

Santiago v. Marquez,
   No. 97 C 2775, 1998 WL 160878 (N.D. Ill. Mar. 31, 1998) ................................ 30

*Santiago v. Walls*,
   599 F.3d 749 (7th Cir. 2010) ................................................................................. 11

Steidl v. Fermon,
   494 F. 3d 623 (7th Cir. 2007) ............................................................................... 40

*Smith v. Cash Store Mgmt., Inc.*,
   195 F.3d 325, 328 (7th Cir. 1999) ......................................................................... 11

*Swanson v. Citibank, N.A.*
   614 F.3d 400 (7th Cir. 2010) ................................................................................. 11

*Tillman v. Burge*,
   813 F. Supp. 2d 946 (N.D. Ill. 2011) ............................................................... 32, 37

*United States v. Read*,
   658 F.2d 1225 (7th Cir. 1981) ............................................................................... 36

*Vasquez v. Hernandez*,
   60 F.3d 325 (7th Cir.1995) ........................................................................ 12, 19, 20

*Walden v. City of Chicago*,
   755 F. Supp. 2d 942 (N.D. Ill. 2010) ..................................................................... 30

*Ware v Carey*,
   75 Ill. App. 3d 906 (Ill. Ct. App.) ......................................................................... 38

*Wallace v. Kato*,
   549 U.S. 384 (2007) ............................................................................................... 24

*Williams v. Valtierra*,
   2001 WL 686782 (N.D. Ill. June 18, 2001) ........................................................... 37

**Statutes**

42 U.S.C. § 1983 ............................................................................................... *passim*

745 Ill. Comp. Stat. 10/9–102 ................................................................................. 41

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 10

Motions to dismiss Plaintiff Nanci Koschman's complaint have been filed by defendant Richard J. Vanecko (Doc. No. 36), by the defendant Cook County State's Attorney officials and Cook County (the "SAO Defendants") (Doc. No. 87), by defendant Darren O'Brien (who is represented by separate counsel from the other SAO Defendants) (Doc. No. 93), and by the City of Chicago Defendants (the "City Defendants") (Doc. No. 96). This consolidated memorandum responds to all of the pending motions and demonstrates that all of them should be denied in their entirety.

## INTRODUCTION: THE FACTS ALLEGED IN PLAINTIFF'S COMPLAINT

Nanci Koschman lost her son David, her only child, because of an act of unprovoked and unjustifiable physical brutality committed on the streets of Chicago by defendant Richard J. Vanecko in the early morning hours of April 25, 2004. Compl. (Doc. No. 1) ¶¶ 32-37. Vanecko and a group of his friends passed David and a group of his friends as the two groups were walking in opposite directions along Division Street that morning. Words were exchanged between the two groups and an argument—limited to words—ensued. Without warning or any physical provocation whatsoever, Vanecko punched David square in the face with brutal force. Vanecko was 10 years older and nearly twice David's size. His blow was devastating. One witness later described hearing a "snap" as the punch landed on David's face, and another said that David came flying out from among the arguing groups as if from an explosion and that he landed like a dead weight. *Id.* ¶ 38.

Mrs. Koschman, who was recently widowed, spent the next eleven days at her son's bedside in the ICU of Northwestern Hospital. David's head had struck the pavement when he fell backwards from the blow, and he suffered multiple fractures to his skull and massive internal bleeding. He died from those injuries on May 6, 2004. *Id.* ¶ 53.

Mrs. Koschman was not present when Vanecko attacked her son and did not know that David's death resulted from Vanecko's unprovoked and unjustified act of physical aggression. *Id. passim.*

In late May 2004, Mrs. Koschman went to a Chicago Police Department area headquarters seeking answers as to how her son had died and to learn what had come of what she surmised was a Police investigation into David's death. *Id.* ¶ 80. At the Police station, she met with Defendant Ronald Yawger, who led the investigation of David's homicide. *Id.* ¶¶ 56, 80. Yawger confirmed that there had been a Police investigation, but he said that every witness to the event had informed the Police that it was David who was the aggressor in the altercation that led to his death. *Id.* ¶ 80. Seeking to dissuade Mrs. Koschman from pursuing a lawsuit against Vanecko, Yawger told Mrs. Koschman that *Vanecko* was the victim of *David's* wrongdoing— *i.e.,* the investigation had concluded that the only person who could conceivably have been charged in the incident was David. *Id.* Yawger also told Mrs. Koschman that she was opposed by powerful forces and that any attempt to litigate in court would be futile. *Id.* This interview was emotionally and psychologically devastating to Mrs. Koschman. *Id.*

Although Yawger's account of the incident was a complete fabrication, his observation that Mrs. Koschman was opposed by powerful forces was spot on. David's killer, Richard J. Vanecko, was the nephew of then-Chicago Mayor Richard M. Daley and the grandson of the City's longtime former mayor, Richard J. Daley (for whom Vanecko was named). *Id.* ¶ 33.

Within hours of the assault, Vanecko informed either Mayor Daley, other Daley family members or associates, or senior members of Mayor Daley's staff about Vanecko's involvement in the assault. *Id.* ¶ 42. In short order, the information was passed along to high ranking officials within the Police Department. *Id.* ¶ 43. The significance of the information was not lost on

anyone.  When news of Vanecko's relationship to Mayor Daley reached Defendants Robert Rybicki and Michael Chasen, who were in command of the initial Police investigation, one of them exclaimed "holy crap, maybe the Mayor's nephew is involved." *Id.* ¶¶ 48-49.

From the moment that Police commanders learned of Vanecko's involvement in the incident, the defendants' handling of the case became an official cover-up.  *Id.* ¶ 50.  Two detectives, Defendants Rita O'Leary and Robert Clemens, had been assigned to conduct the initial investigation, which started normally.  *Id.* ¶ 45.  But when word of the connection between the Daley family and the assault reached these detectives or their supervisors, all work on the case stopped, even though only a first few investigative steps had been completed.  *Id.* ¶¶ 50-52.  For example, although standard procedure was to secure video surveillance footage of what happened—and there was ample video surveillance in the area—O'Leary and Clemens never took this critical step, thereby permanently depriving all concerned of vitally important evidence.  *Id.* ¶ 51.

After David's death eleven days later on May 6, the Police, now faced with a homicide case, had no alternative but to reactivate the investigation.  *Id.* ¶ 54-55.  Yawger was assigned to lead the investigation, assisted by Defendant Anthony Giralamo.  *Id.* ¶ 56, 58.  Yawger and his partner quickly began fabricating a false official record of the incident so that Vanecko would avoid culpability for his crime.  *Id.* ¶ 57.

Yawger and Giralamo interviewed multiple witnesses (members of the two groups and independent bystanders) who had seen the attack.  None of these witnesses reported that David had been physically aggressive before Vanecko punched him.  *Id.* ¶ 63.  Therefore, Yawger set about to undermine the credibility of these witnesses by falsifying their statements, and creating a false official record.  *Id.* ¶ 57.  Yawger's final report in the case falsely stated that, based upon

3

"the interviews of all parties involved . . . David Koschman was clearly the aggressor in this incident." The report also concluded that "David Koschman[] was clearly the aggressor as corroborated by all of the witnesses interviewed, in that . . . Koschman continued to attack [Vanecko's group] . . . resulting in the victim either being pushed or punched in self-defense." *Id.* ¶ 63.

Yawger, Giralamo and O'Leary worked together to rewrite preliminary reports, obliterate some notes, and remove other notes from the file, all to conceal the witnesses' actual statements and to make it appear that the results of the investigation conformed to the false information in Yawger's final report—even though the opposite was the case. *Id.* ¶¶ 59-62.

Yawger and Giralamo deliberately muddied the record even as to the fact that it was Vanecko who threw the fatal blow. Immediately after punching David, Vanecko had fled the scene with one of his male companions. *Id.* ¶ 40. Thus, the patrol officers who responded to the scene did not immediately know his identity. Vanecko's other companions (one man and one woman who remained at the scene) initially lied to the police, but they soon admitted deceiving the investigators and provided them with Vanecko's name. *Id.* ¶¶ 41, 65.

All witnesses agreed that the man who punched Vanecko was the largest one in his group and that the man who threw the punch was not the male individual who remained at the scene. *See id.* Vanecko—6'3" and 230 pounds—was substantially larger than the companion with whom he fled. *Id.* By a process of elimination it was thus inescapable that Vanecko was the attacker. *Id.* Indeed, Yawger has since admitted that he knew as much. *Id.*

For no reason other than to obfuscate that fact, Yawger orchestrated a lineup to be viewed by the witnesses. Yawger made sure that the lineup fillers closely resembled Vanecko (all of the lineup fillers even were larger than Vanecko, whose principal identifying characteristic was his

substantial size). The incident had been a momentary encounter between inebriated strangers on the street at night, and it was thus no surprise that the witnesses, who viewed the lineup on May 20, nearly a month afterward, were unable to identify Vanecko. *Id.* ¶ 67.

Solely because of Vanecko's relationship to the Mayor, the Chief of Felony Review in the Cook County State's Attorney's Office, Defendant Darren O'Brien, was called to the police station the day of the lineup to interview witnesses and "advise" the Police on whether Vanecko should be charged. *Id.* ¶¶ 69-70. O'Brien, in other words, was called in not to examine evidence and decide whether to approve charges sought by the Police, but rather to provide guidance to the Police about how to handle the case—where, of course, the Police had charged nobody, or even "identified" a defendant. In this capacity, O'Brien, together with Yawger, re-interviewed numerous witnesses, who provided ample evidence that Vanecko's assault was unprovoked and unjustified. *Id.* ¶ 71. But Yawger and O'Brien either took virtually no notes of the interviews, or destroyed their notes after the interviews were completed. *Id.* ¶ 72. The State's Attorney's Office in particular requires all felony review assistants who review police cases to create a felony review folder documenting their preliminary investigation, which is to be retained. This was a requirement that O'Brien himself enforced—but he has admitted that in this case, instead of following these procedures he destroyed the felony review folder and, along with it, any notes he took. He did this to obliterate evidence that inculpated Vanecko for David's death. *Id.* ¶ 75.

After consulting with the State's Attorney's most senior management, including Defendant State's Attorney Richard Devine, O'Brien reached the preordained conclusion that Vanecko would not be charged, and the SAO, acting on Devine's behalf, so informed the press. *Id.* ¶¶ 76-77. Defendant Chicago Police Superintendent Phil Cline then falsely told the press that

Vanecko and David were "mutual combatants" and that there was "no basis for criminal charges based on the witness statements and all the evidence that we have." *Id.* ¶ 78.

Thus, when Mrs. Koschman made her trip to the Chicago Police area headquarters to ask about the investigation of her son's death, the official record conformed to the lie that Yawger told Mrs. Koschman: the only person who could conceivably have been charged in the incident would have been David, had he lived. Mrs. Koschman asked Yawger to see the reports of the investigation, but Yawger told her they could only be released via a Freedom of Information Act request. *Id.* ¶ 81. Then, Yawger and his supervisors classified the case as "open"—a designation that was obviously inaccurate and in contravention of standard procedure—so that any ensuing FOIA request would be automatically denied. *Id.* ¶¶ 81-82.

The matter rested in this posture for the next seven years, until reporters with the *Chicago Sun Times* submitted a FOIA request to the City in January 2011 asking for the Police file on the case. *Id.* ¶ 86. For months thereafter, this single FOIA request drew the sustained, focused attention of high level personnel within the Police Department, the State's Attorney's Office and the Mayor's Office. *Id.* Superintendent of Police Jody Weis, purportedly astonished to learn that the case was "open," ordered a re-investigation of the incident. But the purpose of that investigation was only to ratify the results of Yawger's original investigation—and to head off the political fallout that would result if the Police refused to provide the file based on the bogus idea that the investigation was "open." *Id.* ¶¶ 86-87. Indeed, the police involved in this re-investigation maintained frequent contact with Yawger, for no purpose other than to ensure the version of events being fabricated in 2011 matched that from 2004. *Id.* ¶ 101.

The re-investigation was headed up by Defendants James Gilger and Nick Spanos, and supervised by Defendant Sergeant Sam Cirone, a team that was hand-picked by Area 5

Commander Joseph Salemme. *Id.* ¶ 91. Gilger and Spanos began re-interviewing witnesses to the incident. Like Yawger, the detectives methodically created false notes and reports regarding what David's companions and independent bystanders said about the attack—invariably with a view to manufacturing a self-defense case for Vanecko. *Id.* ¶¶ 94-100. Although every witness told them that David had not been physically aggressive at any point, Gilger and Spanos created interview summaries falsely documenting that the witnesses had said the opposite. *Id.*

Gilger and Spanos then prepared a report that, as initially drafted, identified Vanecko as the person who struck David and closed the case without charges. *Id.* ¶ 103. The chain of command wanted more. So Cirone inserted into the draft that witnesses had reported that David "aggressively went after Vanecko stating 'fuck you, I'll kick your ass,'" and that "these aggressive actions caused Vanecko to take action to defend himself and his friends from being attacked." *Id.* ¶ 104. Cirone's insert was pure fabrication; no witness had reported any such thing. *Id.* ¶ 105. Defendant Deputy Chief of Detectives Dean Andrews complimented Cirone, telling him the inserted fabrication was "very nicely done." *Id.* The final report included this phony information. Armed with this report, Defendant Deputy Police Superintendent Ernest Brown falsely told the press that after a "comprehensive" review, the facts in the case "remained unchanged" from 2004, and that it would be closed shortly—as it was three days later. *Id.* ¶ 106.

Nearly from the outset, the State's Attorney's Office was "looped in" regarding the Police re-investigation—as was the office of Chicago Mayor Daley. *Id.* ¶¶ 107-09, 111. Even before Gilger and Spanos had completed their interviews, the Chicago Police Commander of Legal Affairs, Defendant Maureen Biggane, assured personnel in the Mayor's Office that the Police would quickly close the re-investigation without bringing charges. *Id.* ¶ 102.

7

O'Brien informed investigators of his fabricated conclusion that Vanecko had acted in self-defense.  *Id.* ¶ 111.  Defendant Anita Alvarez, the State's Attorney, caused a false statement to be released to the *Sun Times* asserting that "all witnesses who were questioned [during the initial investigation] indicated that Koschman was the aggressor and had initiated the physical confrontation by charging at [Vanecko's group] after they were walking away."  *Id.* ¶ 113.  Acting on instructions from Alvarez and Defendant Daniel Kirk, O'Brien told *Sun Times* reporters the falsehood that all witnesses had told him that Koschman was the "aggressor" in the incident.  *Id.* ¶ 115.

Minutes after a brief meeting that included Alvarez, Kirk, Peterson, Biggane, and other high level Police and State's Attorney officials, the State's Attorney's Office agreed that Vanecko would not be charged, a decision that was once again preordained by the false official record that Police investigators had assembled.  *Id.* ¶ 117.  Alvarez then falsely told the *Sun Times* that "at this time we are unaware of any new evidence that would enable us to bring charges, and therefore we could not bring the case to the grand jury."  *Id.* ¶ 118.  In a subsequent interview, Alvarez told the *Sun Times* that it would be "unethical" to charge Vanecko because of the lack of a "good faith and legal basis to bring charges."  *Id.* ¶ 119.

Then, in a cynical ploy to make it appear that she was supportive of an independent investigation, Alvarez announced that she had referred the case to the Illinois State Police for review.  But, as Alvarez well knew, the ISP's recently appointed Director had a conflict of interest since he had been the Chicago Police Deputy Superintendent who oversaw the Detective Division at the time of the original investigation of David's homicide.  As expected, the ISP refused to take the case.  *Id.* ¶ 120.  At virtually the same moment that Alvarez was making a public show of referring the matter to the ISP, she and Defendant Kirk were blocking an attempt

8

of the Cook County Inspector General to initiate an investigation of the State's Attorney's handling of the case.  *Id.* ¶ 121.

Throughout the re-investigation, the Police were unable even to locate the complete file from their original investigation.  This was because Defendant Chicago Police Lt. Denis Walsh destroyed or hid parts of the file.  *Id.* ¶ 88.  After the re-investigation was closed—and shortly after the City of Chicago's Inspector General Office launched an investigation into the Chicago Police Department's handling of the Koschman investigation—a series of phone calls occurred between Walsh and Yawger, and the files mysteriously reemerged.  *Id.* ¶¶ 122-23.  Walsh "found" the Koschman homicide file at the Area 3 police headquarters on June 29, 2011.  *Id.* ¶ 123.  Yawger "found" his working file the next day.  *Id.*  The files had been altered—possibly by the removal and destruction of material from the files that contradicted the fabricated evidence implicating David as the aggressor.  *Id.* ¶¶ 123-24, 126.  Defendants Gary Yamashiroya and Thomas Flaherty were complicit in the staged "discovery" of the missing, altered files and may have removed or destroyed contents of those files themselves.  *See id.* ¶¶ 89, 123, 126. Defendant Internal Affairs Sergeant Richard Downs conducted a sham investigation into the missing (and mysteriously "found") files, closing his investigation almost immediately and essentially without doing anything.  *Id.* ¶¶ 127-29.

In late 2011, Mrs. Koschman filed a petition in the Circuit Court of Cook County asking for the appointment of a Special Prosecutor to investigate her son's death and the police and prosecutors' handling of the investigation.  *Id.* ¶ 130.  Defendant Alvarez vigorously opposed the petition.  She contended—falsely—that the State's Attorney's Office was actively investigating the incident.  *Id.* ¶ 131.  She insisted, in conformity with her past public statements about the case, that any prospect of future prosecution of Vanecko was "dim."  *Id.*

Over Alvarez's objection, Chicago attorney Dan Webb was appointed Special Prosecutor. *Id.* ¶ 132. Defendant Kirk scoffed publicly at the appointment, falsely telling the *Chicago Tribune* that "there was no admissible evidence that could have been used to file charges" against Vanecko. *Id. ¶* 133. Webb and his team interviewed witnesses and assembled evidence, however, and on December 3, 2012, less than eight months after receiving the assignment, they indicted Vanecko for the reckless use of physical force "without lawful justification" to cause David's death. *Id.* ¶ 134. A little over a year following his indictment, on January 31, 2014, Vanecko pled guilty, finally defeating the conspiracy to cover up his crime. *Id.* ¶ 137. A few days later, on February 4, the Webb team released a 162 page investigative report regarding official misconduct in the handling of the investigation. *Id.* ¶¶ 135, 137.

Vanecko's guilty plea finally undid the cover-up and his phony exoneration, and the Special Prosecutor's report, which was released a few days later, described for the first time and in detail the manner in which the Police and the State's Attorney's Office had fabricated evidence and created a false official record in order to shield Vanecko from civil and criminal liability. *Id.* Mrs. Koschman's complaint was filed in March 2014.

## ARGUMENT

Motions to dismiss pursuant to Rule 12(b)(6) are to attack the legal sufficiency of a pleading. Therefore, to survive a motion to dismiss, plaintiff's complaint must merely state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The complaint, in other words, must contain enough facts that if accepted as true would be sufficient to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The ruling on a motion to dismiss does not afford an occasion to assess the plaintiff's case on its substantive merits, nor should contested facts be resolved. *Smith v. Cash Store Mgmt., Inc.,* 195 F.3d 325, 328 (7th Cir. 1999). Rather,

the complaint need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To determine whether Mrs. Koschman has met this standard, the court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quotation omitted).

At the dismissal stage, importantly, it is not the court's task to assess the likelihood that the plaintiff will ultimately be able to prove her claims. Rather, as the Seventh Circuit observed in interpreting *Iqbal*,

> the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, [at the motion to dismiss stage] the court will ask itself *could* these things have happened, not *did* they happen. For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis original). In making this assessment, the court "must accept [the complaint's] allegations as true, extending to the plaintiffs the benefit of every reasonable inference that may be drawn from the complaint." *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1001 (7th Cir. 2002). Mrs. Koschman's complaint unquestionably passes the threshold. The facts it alleges plausibly state claims upon which relief may be granted. The pending motions should therefore be denied.

11

## I.     COUNT I OF THE COMPLAINT STATES A CLAIM FOR DENIAL OF ACCESS TO THE COURTS.

The "right of individuals to pursue legal redress for claims which have a reasonable basis in law and fact is protected by the First and Fourteenth Amendments." *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir.1995) (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984)). "A corollary of this right," as our Court of Appeals recently noted, "is that efforts by state actors to impede an individual's access to courts may provide the basis for a constitutional claim under section 1983," in the form of a denial-of-access claim. *Cannon v. Burge*, ___ F.3d ___, No. 12–1529, 2014 WL 2185016, at *17 (7th Cir. May 27, 2014). Count I of Mrs. Koschman's complaint alleges that the defendants' actions—individually, collectively, and in conspiracy—deprived her of her constitutional right of access to the courts in order to pursue a claim against Vanecko for David's death.

Denial-of-access claims can come in several forms, as the Supreme Court explained in *Christopher v. Harbury*, 536 U.S. 403 (2002). They can be forward-looking and seek to undo barriers to "suits yet to be litigated"—such as a suit claiming that a filing fee prevents indigent plaintiffs from accessing court. 536 U.S. at 412-13. Or they can be backward-looking, and concern "specific cases that cannot now be tried" as a result of official misconduct in the past. *Id.* at 413-14. Such past misconduct might have caused the loss or inadequate settlement of a meritorious case, *id.* at 414, the loss of an opportunity to seek some particular order of relief, *id.*, or the loss of an opportunity to sue—such as where a "police coverup extend[s] throughout [the] time to file suit under [the] statute of limitations." *Id.* (quotation and ellipses omitted). *See also Jacobson v. Nat'l R.R. Passenger Corp.*, 97-cv-6012, 1999 WL 1101299, at *9 (N.D. Ill. Nov. 29, 1999) (Pallmeyer, J.) ("[W]hen police officers conceal or obscure important facts about a

crime from the public or from the victim 'rendering hollow the right to seek redress,' there is a constitutional violation." (quoting *Bell*, 746 F.2d at 1261)).

The specific claim in Count I is that the conduct alleged in the Complaint—the fabricated official record (and the various acts done to enable the fabrication) painting Vanecko as a victim who acted in self-defense when he punched David—"conceal[ed] or obscure[d] important facts about" what was in fact a criminal assault by Vanecko. Mrs. Koschman alleges that, as a result of the concealment, the defendants "rendered hollow" her right to seek redress against Vanecko for his tortious conduct.[1]

In arguing that Mrs. Koschman's allegations fail to state a denial-of-access claim, the defendants studiously avoid *Bell v. City of Milwaukee*. This is remarkable, because that Seventh Circuit precedent, which dealt with allegations strikingly similar to the ones here, obviously controls and governs Count I. In *Bell*, the Court of Appeals held that when government officials lie about the results of an investigation or fabricate evidence and thereby create a formidable barrier to the ability of a citizen to achieve a fair disposition of her case, they violate the right of access to the courts that is secured by the First and Fourteenth Amendments. *Bell*, 746 F.2d at 1262-63. Under *Bell,* when the plaintiff shows that the defendants fabricated evidence or obscured the actual facts, the burden shifts to the defendants to "establish[]" that the plaintiff would have been able to overcome this obstruction of justice and achieve a "fair disposition" of her claims. *Id.* at 1228.[2]

---

[1] Mrs. Koschman here asserts claims against Vanecko arising from that conduct in Counts III-V of the Complaint. Vanecko, predictably, has moved to dismiss those claims as barred by the statute of limitations. Vanecko's motion is addressed in Section VII, *infra*.

[2] Even if it were Mrs. Koschman's burden to show that the defendants' misconduct prevented her from pursuing her claims, as the City Defendants suggest elsewhere (*see* City Motion at 13-14 (citing *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000) for the proposition that establishing causation is Plaintiff's burden), the question is still a factual one that cannot be resolved on a motion to dismiss. *See May*, 226

13

In *Bell,* the plaintiffs' decedent, Daniel Bell, was shot and killed in February 1958 by a Milwaukee police officer (Thomas Grady) during a chase following a traffic stop. Grady's shooting was wrongful and unjustified. In an attempt to conceal that fact, Grady and his partner, Louis Krause, planted a knife in Daniel Bell's right hand and manufactured a story that the shooting was justified because Daniel had lunged at Grady with the knife. 746 F.2d at 1215-16. The police department and local prosecutor engaged in an extensive cover up to uphold the officers' fabricated story.

From the beginning, though, the cover up was a botched affair. The knife had been planted in Daniel's right hand. But Daniel was left handed. *Id.* at 1217. Daniel actually did possess a knife, but at the time of his death, that knife was at home in the bathroom of the house where Daniel resided with his sister. *Id.* And there were eyewitnesses at the scene who contradicted the officers' false account. Two men, Wesley McCloud and Edward Hammond, came forward just days after the shooting to say that they "did not see Daniel Bell threaten Grady with a knife at the death scene." *Id.* at 1220. At an inquest, a third bystander witness, William Hochstaetter, testified that he had heard the fatal shot and had come to the scene immediately, and saw no knife in Daniel's hands. *Id.* at 1222.

The officers' own account of the shooting shifted implausibly in the days after the event. They initially told investigating officers that Grady shot Daniel from a distance of 10 to 23 feet. But that was inconsistent with the theory that Grady had acted in self-defense against a knife-wielding assailant, so the officers changed their account to say the shot was fired at a distance of six feet. *Id.* at 1219. Then, to conform to forensic evidence, Grady provided a third account in which he said the shot was fired at near point blank range. *Id.* at 1221. All of these holes in the

---

F.3d at 883 (noting that plaintiff's allegation that government defendants' activities prevented him from making court appearances was sufficient to state a denial-of-access claim at the dismissal stage).

official story were well known to the Bell family; they were either reported in local news or were the subject of testimony at the inquest,[3] which the Bell family attended. *See id.* at 1217 n.9, 1219, 1220, 1221.[4]

In 1959, Daniel's father, Dolphus Bell, sued the City of Milwaukee for wrongful death. In defense the City presented the officers' false account, and the case ended in a mistrial. *Id.* at 1222-23. Daniel's father then settled the case for a nominal amount. *Id.* Nothing further happened until 1978, when Krause came forward and informed a new local prosecutor that the story had been fabricated, exposing the conspiracy that he, Grady, and the other officials had perpetuated for two decades. *Id.*

By then, Dolphus Bell was long dead and, of course, the statute of limitations had run out on the wrongful death claim many years before. In 1979, though, Daniel's siblings filed suit, contending that the cover-up of the true circumstances of the killing had deprived the family of a fair opportunity to present the wrongful death claim in court. *Id.* at 1224. Daniel's siblings tried their case and won a substantial jury verdict, which the Seventh Circuit affirmed on appeal. The Bell family had a viable constitutional claim for denial of access to the state and federal courts, it held, because the officers' "cover-up and resistance" had deprived the family of a fair opportunity to present their wrongful death claims. *Id.* at 1261. Although the courthouse door was not literally barred to the family—Dolphus Bell had pursued his earlier suit all the way to trial—the cover-up "rendered hollow" the proceedings in his case. *Id.*

Mrs. Koschman makes the same claims here. Acting to cover up a crime committed by a son of Chicago's most powerful political family, Chicago Police and Cook County State's

---

[3] Based on the false version of events presented by the police and biased questioning by prosecutors, the death was adjudged justified at the inquest.

[4] The Bell family's suspicions could only have been heightened when, after they pointed out inconsistencies in the official story, the police threatened to arrest them. 476 F.2d at 1227.

Attorneys acted in conspiracy to create a false official account of the incident in which David Koschman was killed. Although Vanecko's assault of David was unjustified and criminal, the defendants created a false official record of the investigation, labeling Vanecko as the victim of David's unjustified aggression. The phony record culminated with the official conclusion—publicly trumpeted—that David "was clearly the aggressor as corroborated by all of the witnesses interviewed, in that . . . [he] continued to attack [Vanecko's group] . . . resulting in the victim either being pushed or punched in self-defense." Compl. ¶ 63. In a re-investigation seven years later, Police added to the fabricated account, filing an official report that falsely reported that multiple witnesses said David "aggressively went after" Vanecko, saying "fuck you, I'll kick your ass," and falsely concluded that "[David's] aggressive actions caused Vanecko to take action to defend himself and his friends from being attacked." *Id.* ¶ 104.

Like the official version and cover-up in the *Bell* case, these false official records and police perjury concealed and obscured the truth and thereby erected a substantial barrier to Mrs. Koschman, depriving her of her fair opportunity to go to court to vindicate her son's death. Unlike Dolphus Bell, Mrs. Koschman never attempted litigation in the face of the false official record during the limitations period. But even the defendants do not suggest that distinction makes a difference. *Christopher v. Harbury* holds that access to the courts may be denied not only by official misconduct that results in an unfair settlement of a claim (a proposition for which the Supreme Court approvingly cited *Bell*), but also by the loss of an opportunity to sue—such as where a "police coverup extend[s] throughout [the] time to file suit under [the] statute of limitations." 536 U.S. at 414.[5] Unquestionably, Count I of Mrs. Koschman's complaint states a

---

[5] Indeed the *Bell* plaintiffs—Daniel Bell's siblings—were not plaintiffs in their father's original suit, and were thus suing for the first time in 1979.

claim for denial of access to the courts by virtue of a "police cover-up" throughout the period of the statute of limitations.

The defendants' motions make two arguments. They claim that the cover-up in this case was not sufficient to deprive Mrs. Koschman of access to the courts. And they argue that Mrs. Koschman's denial-of-access claim was filed too late. Neither contention survives scrutiny.

### A. Count I Sufficiently Alleges that Mrs. Koschman Was Deprived of Access to the Courts As a Result of the Defendants' Cover-Up of the Truth about David's Homicide.

The City Defendants argue that Mrs. Koschman cannot state a claim for denial of access to the courts because she had available (or could have discovered) information suggesting Vanecko's culpability for David's death and could have filed a claim against Vanecko before the statute of limitations ran. *See* City Motion at 9-16 and 3-9. Mrs. Koschman had reason to suspect the Police might be lying about their investigation as early as 2004, the defendants argue, so the fact that she did not pursue a claim against Vanecko then was not the result of the defendants' misconduct.

*Bell* disposes of this argument. The *Bell* plaintiffs, of course, also suspected that the police were lying, and with good reason—three eyewitnesses had come forward to contradict the officers' false account; the officers had planted the knife in the wrong hand (and the family knew that the planted knife was not actually Daniel's); and the officers gave implausibly shifting accounts of the shooting to conform to the forensic evidence and their manufactured justification for the killing.

Citing these facts, the *Bell* defendants (like the defendants here) argued that because the Bell family "knew from the very beginning that the police must have been lying and covering up the true circumstances of the shooting," the family lost their underlying claims not as a result of

17

the cover-up, but because they did not sufficiently investigate.  *See* 746 F.2d at 1227-28.  The

*Bell* court rejected this argument emphatically—just at it must be rejected here.  As the Seventh

Circuit explained:

> The depositions and testimony of Daniel Bell's siblings and the Bell family's
> attorneys certainly support the proposition that at the time of the state court
> action they believed Daniel Bell was innocent of any wrongdoing and that the
> police had lied.  But *the Bell family, with their beliefs alone, were deprived of
> a fair opportunity to seek redress by virtue of defendants' fraudulent
> concealment of facts crucial to the fair disposition of the dispute.*  Not only did
> Grady and others cover up what actually happened the night of the shooting,
> but, according to the testimony of Sylvia White Bell, when some members of
> the Bell family went to the police that night for an explanation, they were told
> "niggers get out of here," or be jailed.  At the coroner's inquest, conducted as a
> non-adversarial proceeding without opportunity for cross-examination, Bell
> family questions were largely ignored.

*Bell*, 746 F.2d at 1227-28 (emphasis added).

Mrs. Koschman's complaint makes the same claim:  she was deprived of a fair

opportunity to seek redress for David's death because the defendants concealed the truth about

the incident and created a false official record.  When she went to the police station to inquire

about the findings of the Police investigation, Defendant Yawger told her that David was the

only one at fault in the incident that resulted in his homicide, and that had he lived, *David* likely

would have been charged for his physical aggression toward Vanecko.  This false version was

repeated in public pronouncements by high-ranking police and SAO Defendants. The Chicago

Police and SAO accounts may not have been impermeable—neither was the official account in

*Bell*[6]—but under the reasoning of that decision, those findings, and the fabricated evidence that

---

[6] The official record in *Bell* was in the form of inquest findings that the homicide of Daniel Bell was
justified.  The City Defendants argue that in this case, by contrast, "there was never an affirmative
conclusion in a formal proceeding that Koschman's death was justified."  City Motion at 15.  As an initial
matter, the denial of access to the courts was accomplished not only through the inquest, of course, but
also through the officers' false testimony in Dolphus Bell's original suit.  *Bell*, 476 F.2d at 1223.  And
here, moreover, the defendants did create an official record, in the form of official police reports in 2004
and in 2011 setting out the government's conclusions regarding its investigation and re-investigation of

18

supported them, were certainly enough to form a "formidable barrier" to fair resolution of Mrs. Koschman's claims against Vanecko.

The defendants discuss *Bell* only briefly and deep in their papers, and their only acknowledgement of the case is to seriously mischaracterize it. They argue summarily that *Bell* "held that the plaintiffs had been denied access to the courts when a police officer shot and killed an unarmed man, was the only witness to the shooting, and orchestrated a cover up," such that "only the officers' side of the story existed." City Motion at 15. But that is not what happened in *Bell*. As even a cursory reading of the opinion makes clear, the plaintiffs in *Bell* were aware of numerous facts that undermined the phony police account of the shooting—including the testimony of multiple eyewitnesses at the scene, who outnumbered the police. The other side of the story, in other words, *did* exist. The constitutional violation there, as here, lay in the fact that the fabricated official account created a formidable barrier to a fair disposition of the case. Mrs. Koschman's allegations, the defendants' arguments to the contrary notwithstanding, are on all fours with *Bell*.

Nor, contrary to the City Defendants' arguments, is there anything in the Seventh Circuit's subsequent decisions that suggests a different result. In *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995), the Court of Appeals ratified *Bell* and explained that the "cornerstone of . . . *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." 60 F.3d at 329. The plaintiff in *Vasquez* was not entitled to relief under that "cornerstone," but only because the facts of that case were very different from those in *Bell* (and from those here).

---

David's death. The City Defendants do not acknowledge this fact, nor do they explain why the fraudulent inquest in *Bell* and the false police reports here are any different for purposes of Plaintiff's denial-of-access claim. In both cases, official findings and related fabrications by government officials posed formidable barriers to proving that the homicide was tortious.

In *Vasquez*, after the plaintiff was shot by an off-duty police officer in January 1991, local police hid evidence and attempted to obscure the officer's role in the shooting. 60 F.3d at 326-27. But an FBI task force unraveled the cover-up within five months, and plaintiff filed her underlying claims against the officer one month after that, in June 1991—with the benefit of the FBI's investigation and well within the statute of limitations. *Id.* at 329; *and see* Complaint (Doc. No. 1) filed in *Vasquez v. Hernandez*, No. 91-cv-4008 (N.D. Ill.) on June 26, 1991. On these facts, the plaintiff's denial of access to the courts claim obviously failed. As the Court of Appeals explained, "There are no allegations claiming that the Vasquezes have been prevented from pursuing a tort action in state court or that the value of such an action has been reduced by the cover-up." *Vasquez*, 60 F.3d at 329. Mrs. Koschman's complaint, on the other hand, does include such allegations, and they are amply supported.

The Seventh Circuit's recent *Cannon* decision also provides no aid to the defendants. The plaintiff in *Cannon* had been tortured by Chicago Police officers under the command of Jon Burge. Although the plaintiff alleged that the City had covered up the Burge scandal, the Seventh Circuit panel rejected his claim because the plaintiff himself was personally present and thus a witness to his own torture. The *Cannon* court distinguished *Bell* because, unlike the Bell family, "Cannon . . . . knew first-hand that he had been abused by the officers, that he had falsely confessed . . . . [and] knew that the officers were lying or omitting relevant facts from their later accounts of their actions." 2014 WL 2185016, at *18. The Court of Appeals concluded that this first-hand knowledge turned *Cannon* into "a typical he-said/they-said controversy" and distinguished it from the Bell family's claims, which centered on events they had not seen. *Id.*[7]

---

[7] The City Defendants also cite the District Court decision in *Orange v. Burge*, 451 F. Supp. 2d 957 (N.D. Ill. 2006), in which the plaintiff made a denial-of-access claim similar to the one in *Cannon*. The District Court rejected the claim on the same basis, distinguishing *Bell* because "Orange was obviously *personally present* at the alleged detention and torture, and thus had personal knowledge of his potential

20

The City Defendants try to suggest that *Cannon* somehow requires that a plaintiff be in complete ignorance of the truth about what really happened in order to state a claim. But *Cannon* specifically noted that a plaintiff may have knowledge of official lies and still be denied access to the courts, emphasizing that "Bell's family knew from the start that the police had lied." *Id.* at *14. The distinction, *Cannon* held, was that the Bell family did not personally witness the covered-up events, while Cannon did. That distinction, of course, applies equally to Mrs. Koschman's claims here. Daniel Bell, like David Koschman, was deceased and could not testify to the covered-up facts. The Bell family, like Mrs. Koschman, was unable to testify from personal knowledge about the underlying tort, despite their suspicions. That is why the allegations of the Bell family, like those of Mrs. Koschman, were distinguished from "a typical he-said/they-said controversy" and instead stated a claim for denial of access to the courts. *Cannon* thus does nothing to limit *Bell*'s application to Mrs. Koschman's claims.

Therefore, Count I states a claim for denial of access to the courts under *Bell* and its progeny. The defendants' arguments must be rejected.

**B. Mrs. Koschman's Denial-of-Access Claim is Timely.**

The defendants next contend that, even if it was once viable, Mrs. Koschman's claim for denial of access to the courts was not filed within the statute of limitations for such claims and must be dismissed as untimely.

The defendants put forward three alternative theories: (a) the statute of limitations expired in late May 2006, two years from the day Mrs. Koschman heard from Defendant Yawger that, by all witness accounts, David was the aggressor and would have been charged if he had survived—since Mrs. Koschman should have known then "a cover-up and undue influence were

---

claims on the date they allegedly occurred." 451 F. Supp. 2d at 964 (emphasis added). *Orange* therefore stands on the same footing as *Cannon* and, since it is likewise fully distinguishable, provides no support for the defendants' argument.

afoot" (O'Brien Motion at 6); (b) the statute of limitations expired on May 6, 2008, two years from the expiration of the statute of limitations for the wrongful death claim on David's behalf—since the denial-of-access claim "accrued" upon the expiration of the statute for the underlying claim (City Motion at 3-9); or (c) the statute of limitations expired on December 13, 2013, two years from the date Mrs. Koschman petitioned for a Special Prosecutor—since she "had sufficient information to bring her claims" at the time of that filing (City Motion at 9-12).

Here again, the defendants studiously avoid any mention of the teaching of *Bell*, the controlling Seventh Circuit precedent. *Bell* holds that in a denial-of-access case, the statute of limitations begins to run on the date the official cover-up is defeated and the "formidable barrier" to the fair resolution of the plaintiff's case is removed. In *Bell*, the obstruction "continue[d] as late as 1978," when Krause, one of the officers, defeated the conspiracy by exposing and undoing the cover-up. 476 F.2d at 1229. "Since [the *Bell*] action was filed in 1979, the conspiracy claim was filed less than two years after accrual and thus is not barred by [the] statute of limitations." *Id.*

In Mrs. Koschman's case, the barrier to a fair disposition of Mrs. Koschman's wrongful death claim was not removed until Vanecko's conviction on January 21, 2014. Until that occurred, the false official version—in which Vanecko was the victim of David's aggression—posed a formidable impediment to the fair disposition of any claim Mrs. Koschman might have made against Vanecko. Even if Mrs. Koschman was aware of evidence that caused her to doubt the legitimacy of the official account, such doubts would have been her "beliefs alone" (*compare Bell*, 746 F.2d at 1228), until that barrier was removed. Since Mrs. Koschman filed her complaint within two years of the charges against Vanecko, it is timely.

The defendants' alternative theories as to the running of the statute of limitations are unpersuasive and should be rejected—even apart from the lack of legal support.

*First*, O'Brien's argument that Mrs. Koschman's May 2004 interview with Yawger triggered the statute of limitations fails. At the meeting, Yawger fed Mrs. Koschman the fake official story, including that David was to blame for his own death, told her that she was opposed by powerful forces, and said that litigation would be futile. Compl. ¶ 80. O'Brien argues that this put Ms. Koschman on notice that something was amiss and her denial-of-access claim thus accrued. But this argument founders on *Bell*, where Daniel Bell's siblings were given reason to suspect that something was amiss from the first moments after they heard the official version of events, where police claimed that Daniel had used a knife that the siblings knew was not his, in a hand the siblings knew Daniel did not favor. *See Bell*, 476 F.2d at 1217. *Bell* held that such knowledge did not start the running of the statute on the plaintiffs' denial-of-access claims; even though the Bell family believed at the time that "the police had lied," *id.* at 1227, their claims did not accrue until the conspiracy was defeated twenty years later. *Id.* at 1229. Only if *Bell* is ignored could O'Brien's argument be accepted.

*Second*, the City Defendants' principal argument—that the expiration of the statute of limitations for Mrs. Koschman's underlying wrongful death claim triggered the start of the statute of limitations for the denial-of-access claim in this case—is equally unpersuasive, because it turns on an incomplete and incorrect interpretation of claim accrual. The City Defendants contend that, with the running of the statute of limitations on the wrongful death claim, Mrs. Koschman lost her right to sue Vanecko. At that moment, the City Defendants contend, Mrs. Koschman had "a complete and present cause of action" for denial of access to the

courts, starting the clock on the statute of limitations. *See* City Motion at 4-5 (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)).

This argument founders on common sense. By definition, the plaintiff in a so-called "backward looking" denial-of-access case has alleged that formidable, illegal barriers have prevented her from gaining a fair resolution of her claim. The essence of the constitutional tort is that, throughout the limitation period *and potentially beyond*, the plaintiff faced barriers to suit (this went on for 20 years in *Bell*, and nearly 10 years here). The City Defendants propose an approach that would reward the imposition of these barriers, and place the denial-of-access plaintiff in an impossible position. Essentially, the City Defendants would require a plaintiff to file her claim on the City Defendants' timeline, and then do in her denial-of-access suit the very thing that she must allege she could not do—namely, unravel the conspiracy and prove her underlying claim. Accepting the City Defendants' position, in other words, would effectively make un-actionable any claim for denial-of-access in which the official cover-up had not already been defeated within two years of the running of the statute of limitations for the underlying tort.

Fortunately, *Bell* says the opposite. Denial-of-access claims accrue when the cover-up is exposed and the official fabricated account no longer interposes the barriers that prevented the plaintiff from vindicating her claims. *See* 746 F.2d at 1229. Indeed, if the City Defendants' contentions were applied to the Bell family, their case—which was not filed until 1979, more than two decades after Daniel Bell's wrongful death—would have been summarily dismissed.

The Supreme Court's decision in *Wallace* is in full accord. There, the Court noted that the claim accrual rule recognizes the "reality" that in certain circumstances, such as false imprisonment and other "analog[ous]" cases, the nature of the tort itself prevents the plaintiff from suing. In such cases, the claim accrues when the condition preventing the plaintiff's suit

24

ends. 549 U.S. at 388. Unquestionably, a claim for denial of access to court falls in this category of claims: the very essence of the tort is that the plaintiff has been prevented from accessing the courts. Under the reasoning of the City Defendants' own cited case, therefore, the running of the statute of limitations for denial-of-access claims begins, just as *Bell* held, when the barrier to suit ends. *See id.* at 390.

*Third*, the City Defendants' alternative argument—that the statute of limitations began to run when Mrs. Koschman petitioned for the appointment of a special prosecutor—is nothing more than a veiled attack on the underlying merits of Mrs. Koschman's denial-of-access claim and must be rejected for all the reasons set out in the preceding section. Mrs. Koschman's claim turns on the fact that the official record of the government's "investigation" into David's death and related fabrications posed a formidable barrier to the fair resolution of any claims arising from his battery and wrongful death. In December 2011, Mrs. Koschman certainly had reason to believe that the investigation into David's death was corrupt—and she expressed those reasons in her petition for appointment of a special prosecutor. But her beliefs alone could not bring down the barriers that the defendants had erected to prevent her from holding Vanecko responsible for her son's death.

The cover-up of Vanecko's culpability in David's homicide continued to impose formidable barriers to Mrs. Koschman's suit until Vanecko pled guilty, defeating the conspiracy. If Mrs. Koschman had brought suit at any point prior to Vanecko's conviction—if, for example, she had attempted a denial-of-access claim in this court simultaneous to the filing of her December 2011 petition for a special prosecutor in the Cook County Circuit Court—these same defendants would have stood by their fraudulent investigation and would have used it to defeat Mrs. Koschman's claims, just as the defendants did against Dolphus Bell. Indeed, Defendant

Alvarez's filing in opposition to Mrs. Koschman's special prosecutor petition took essentially that position, ridiculing her petition as utterly without merit because the Police records and the State's Attorney's own investigation purportedly demonstrated that there was no prospect Vanecko could be charged with anything. *See* Compl. ¶¶ 131-33. Thus the City Defendants' assertion (on p. 11 of their Motion) that "every pertinent 'fact' forming the basis for the present claim is set forth in over 20 pages of detail in [the] December 2011 [petition]" is highly inaccurate. The City Defendants have simply ignored the controlling event, and the nature of the obstruction.

Until Vanecko had pled guilty, in other words, Mrs. Koschman faced formidable barriers to vindicating her rights in court. Just as the Bell family faced formidable barriers to vindicating their brother's death until Krause defeated the cover-up, Mrs. Koschman could not vindicate her rights in this case until she could prove that the defendants had covered up the truth that Vanecko was in fact criminally liable for David's death. She did not have that ability when she filed her December 2011 petition, when the false version of events created by the defendants still held sway and could have been used to defeat her claims in court. The defendants, of course, are free to argue that Mrs. Koschman could have overcome their cover-up in December 2011 or earlier, but that is a question of fact that must not be decided at this stage.

*Bell*'s holding with respect to the commencement of the statute of limitations controls and must be applied in this case. The application of that holding is straightforward: the statute of limitations on Mrs. Koschman's claims did not begin to run until Vanecko was convicted of the crime that the defendants had covered up. Since this suit was commenced well within two years of that date, it is timely. The defendants' arguments must be rejected.[8]

---

[8]  The foregoing arguments also defeat the City of Chicago's argument that Mrs. Koschman fails to sufficiently allege a *Monell* claim. The City's *Monell* argument is fully derivative of the attack on Mrs.

## II.     COUNTS VI AND VII OF THE COMPLAINT STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The City Defendants, the SAO Defendants, and O'Brien contend that Counts VI and VII should be dismissed, either because they are insufficiently pled, and/or because they are barred by the statute of limitations.  *See* SAO Motion at 6-8, 10; City Motion at 12-13; O'Brien Motion at 9.  These arguments lack merit.

### A.   Counts VI and VII Sufficiently Plead that the Defendants, Acting in Concert, Caused Mrs. Koschman to Suffer Severe Emotional Distress.

The SAO Defendants contend that Counts VI and VII, which assert a claim under Illinois law for intentional infliction of emotional distress ("IIED"), fail to allege any action on the part of those defendants that could plausibly have caused Mrs. Koschman to suffer severe emotional distress.  *See* SAO Motion at 7-8.  Specifically, the SAO Defendants argue that the IIED claims fail because paragraphs 173 to 177, which set out the IIED counts, lack specificity.  *See* SAO Motion at 7-8.  This argument is hard to take seriously.  Counts VI and VII incorporated the allegations made in the remainder of the complaint, *see* Compl. ¶¶ 172, 174, and thus the IIED allegations are plainly not limited to the handful of paragraphs the SAO Defendants highlight.

As summarized above, the Complaint alleges that Mrs. Koschman, recently a widow, lost her only child David, a young man who had just turned 21, as a result of a criminal act of unjustified physical aggression on the streets of Chicago.  The anguish of any mother facing such a loss cannot be overstated.

---

Koschman's underlying claim.  *See* City Motion at 16.  Since the underlying claim is sufficiently alleged, the City remains a defendant.  Mrs. Koschman's official capacity claim against Defendant Jody Weis is the legal equivalent of the *Monell* claim, as the City Motion notes.  *See id.* at 19.  Though the official capacity claim against Weis may be "duplicative" of the *Monell* claim, the City Motion offers no substantive reason why Weis should be dismissed from the case at this time.  He should also remain a defendant.

The person who killed David turned out to be the nephew of Mayor Richard M. Daley, the most powerful person in Chicago. To protect Vanecko, the defendants conspired to fabricate false evidence against David—that *he* was the attacker in the altercation, and that his killing was therefore justified. In furtherance of this conspiracy, Yawger told Mrs. Koschman not only that the official investigation exonerated her son's attacker, but that if David had lived, he would have been charged for attacking his killer. The high-level CPD and SAO defendants trumpeted their phony findings in the media and persisted for many years in their false account of investigation. Mrs. Koschman was powerless to refute these falsehoods, which greatly compounded her anguish at the loss of her son.

These acts, the Complaint alleges, were extreme and outrageous, Compl. ¶ 173, were undertaken by the defendants with the requisite intent, *id.* ¶ 174, and proximately caused Mrs. Koschman to suffer severe emotional distress. Inarguably, the facts alleged satisfy the elements of a claim for intentional infliction of emotional distress. *See, e.g.*, *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (holding that to state an IIED claim, "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." (quotation omitted)). Indeed none of the defendants argues otherwise, and nor could they. *Cf. Bell*, 746 F.2d at 1266 (acknowledging the extreme emotional distress caused by such an official conspiracy: "The conspiracy succeeded in covering up the truth—and depriving the plaintiffs of their constitutional rights—for a generation. While it is exceedingly difficult to place a monetary value on the resulting emotional distress, the jury was well-instructed and made awards well within their discretion.").

28

Instead of challenging the merits of Mrs. Koschman's claim, the SAO Defendants and O'Brien seek to uncouple themselves from their co-conspirator defendants, contending that the actions they personally are alleged to have committed are insufficient to qualify as IIED. But the Complaint not only alleges overt acts by these Defendants that were in and of themselves outrageous; it also alleges that the prosecutor Defendants acted in conspiracy with the City Defendants. *See* Compl. ¶¶ 173, 177. As these defendants surely know, all participants in a conspiracy are liable for the actions of each and every act of their co-conspirators. As the Illinois Supreme Court observed in *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994), "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted[,] or encouraged the wrongdoer's acts." 645 N.E.2d at 894. Thus it is a basic feature of conspiracy liability that each conspirator "may be held liable for any tortious act committed in furtherance of the conspiracy" by a co-conspirator. *Id.* at 895.

This is black-letter law, and the SAO Defendants do not even hint at why it should not be applied to them. Counts VI and VII sufficiently allege a claim against the SAO Defendants and O'Brien for intentional infliction of emotional distress.

### B. The Intentional Infliction of Emotional Distress Claim in Counts VI and VII is Timely.

There is also no question that Mrs. Koschman's intentional infliction of emotional distress claim is timely. Mrs. Koschman's IIED claim incorporates the SAO and City Defendants' misconduct, as well as Vanecko's criminal acts committed in 2004. *See* Section II(A), *supra*. The City and SAO Defendants' acts of suppression and fabrication were ongoing for a period of ten years—beginning with the initial 2004 investigation and continuing throughout the re-investigation in 2011, the Special Prosecutor investigation in 2012 and Vanecko's initial criminal proceedings through 2014—and thus constitute a "continuing tort"

29

under Illinois law, for which the statute of limitations begins to run "at the time the last injurious act occurs or the conduct is abated." *Lanza v. City of Chicago*, No. 08-cv-5103, 2009 WL 1543680, at *5 (N.D. Ill. June 2, 2009) (citing *Feltmeier*, 207 Ill.2d at 285, and acknowledging that IIED is a "continuing tort" in Illinois). In accordance with *Feltmeier*, the City and SAO Defendants' conduct did not abate until the cover-up came to light—when Vanecko was convicted on January 21, 2014.

In analogous circumstances, decisions in this district have held that IIED claims stemming from malicious prosecutions, caused by such official misconduct as concealment and fabrication, are of a continuing nature and thus do not accrue until the official misconduct is resolved, meaning the prosecution is terminated in the plaintiff's favor. *See*, e.g., *Santiago v. Marquez*, No. 97-cv-2775, 1998 WL 160878, at *3 (N.D. Ill. Mar. 31, 1998) ("The intentional infliction of emotional distress claim, which realleges not only the wrongful arrest and beating but all of the events by which the Police Defendants sought to cover up the beating up to and including the false charges and the malicious prosecution, did not accrue . . . until the state criminal proceedings were terminated in Santiago's favor."); *Pierce v. Pawelski*, No. 98-cv-3337, 2000 WL 1847778, at *9 (N.D. Ill. Dec. 14, 2000) (following *Santiago* and concluding that because "[the plaintiff's] IIED claim is based not just on the events occurring on the day of his arrest, but on defendants' participation in his wrongful prosecution and their allegedly false testimony at his trial," the plaintiff's "IIED claim did not accrue until Pierce's [acquittal]"); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 962 (N.D. Ill. 2010) (stating that an IIED claim is not time-barred when it is intertwined with malicious prosecution claim). The same principle should apply here, where Mrs. Koschman's IIED claim arises from the defendants' preventing

her from vindicating her rights in court, which continued until the conspiracy was finally defeated with Vanecko's guilty plea.

The IIED claim stemming from Vanecko's criminal acts is timely for the same reason that Nancy Koschman maintains a viable denial-of-access claim. The Defendants' cover-up prevented her from seeking redress from Vanecko for wrongful death; it also hindered her from seeking justice for the emotional distress she suffered as a result of her son's murder. *See Bell*, 746 F.2d at 1265. The defendants' ongoing acts of concealment defeat any statutory bar to suit.

Consequently, Mrs. Koschman's IIED claim should proceed against all Defendants.

## III. THE COMPLAINT SUFFICIENTLY ALLEGES A CONSPIRACY AMONG THE DEFENDANTS.

All of the law enforcement defendants contend that the conspiracy allegations in the Complaint are insufficient—*i.e.,* "cursory" (O'Brien Motion at 3), "catch-all" (City Motion at 17), lacking "reference to the time, place specifics or individual actors" (SAO Motion at 7). Then, as if there were no conspiracy allegations in the Complaint, the SAO Defendants and O'Brien proceed to argue that the allegations of their own overt acts (viewed without reference to those of their co-conspirators) are insufficient to establish their liability. This section responds to this misguided line of argument.

### A. The Complaint Contains Sufficient Allegations Regarding the Conspiracy to Satisfy the Pleading Requirements.

It is settled law that a complaint need not plead the details of a conspiracy. Rather, the Seventh Circuit merely requires the plaintiff to provide sufficient notice to allow a defendant to respond by alleging (a) the parties involved in the conspiracy; (b) the general purpose of the conspiracy; and (c) the approximate date of the conspiracy. *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). Illinois state law is in accord with respect to conspiracies alleging violations

of state law. *See, e.g., Adcock*, 645 N.E.2d at 895 (noting that the nature of conspiracies, "shrouded in mystery," prevents a plaintiff from pleading all the details of the conspiracy with particularity).

These pleading requirements appropriately reflect the impossibility of knowing the particulars of an agreement others have reached to deprive the plaintiff of her rights. *See Quinones v. Szorc*, 771 F.2d 289, 290-91 (7th Cir. 1985) ("The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial."); *accord McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) ("A conspiracy is almost never susceptible to direct proof."). For this reason, a conspiracy complaint need not include allegations as to precisely how and when the defendants formed the conspiracy. *See Loubser*, 440 F.3d at 443; *Quinones*, 771 F.2d at 291. Rather, a complaint is sufficient if it pleads facts that circumstantially warrant the logical inference of conspiracy. *Patterson v. Burge*, 328 F. Supp. 2d 878, 903 (N.D. Ill. 2004). *Accord Adcock,* 645 N.E.2d at 895 (a conspiracy is established "from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." (quotation omitted)).

Thus, the question is whether Mrs. Koschman has alleged enough specific facts about defendants' actions to permit the reasonable inference that they were part of a conspiracy. This court held in *Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011), for example, that the plaintiff had sufficiently alleged a conspiracy to cover up police torture where the plaintiff's "allegations suggest that [his] torture was more than just an isolated incident, and suggest,

further, that the suppression of the truth about what occurred at Area 2 was the result of
coordinated efforts that continued for some time," including "a litany of actions at Area 2
furthering and concealing the abuse that took place there." 813 F. Supp. 2d at 976. In ruling
those allegations to be sufficient the court observed, "More specific allegations against the
individual Defendants—a showing that their decisions to join in the general purpose of the
conspiracy were deliberate and coordinated, for example—would indeed be helpful. The nature
of conspiracy itself often prohibits such detail at the pleading stage, however." *Id.*

Mrs. Koschman's complaint easily fulfills the three requirements set forth *Loubser*.
*First*, the Complaint identifies each of the parties involved in the conspiracy—*i.e.*, all the named
individual defendants and several non-defendant co-conspirators, Compl. ¶¶ 4-25, 30-31,
alleging that each such defendant participated in the conspiracy *id.* ¶ 140. *Second*, the Complaint
identifies the general purpose of the conspiracy, alleging that the conspirators acted "with the
shared intent of injuring Plaintiff and violating her Constitutional rights, particularly her right to
access to the courts," *id.* ¶ 140, which they did by

> manufacturing, altering, suppressing and otherwise fabricating false and
> misleading evidence, making false public statements about the David
> Koschman case, deciding, in 2004 and again in 2011 not to charge and
> prosecute Vanecko, conducting sham investigations, exercising undue
> influence over the investigations and the decisions made therein, destroying
> and altering evidence that inculpated Vanecko, and giving false and incomplete
> statements and testimony in official reports, to investigators, and before the
> special grand jury

*Id. Third*, the Complaint alleges the approximate dates of the conspiracy, which ran from the
days immediately after Vanecko's attack on Koschman in April 2004 through Vanecko's
indictment 2012, until the conspiracy was finally defeated with his guilty plea in 2014. *See id.*
¶¶ 43, 48, 134, 137, 138, 143. These allegations alone are adequate to satisfy the pleading
requirements of *Loubser*.

The defendants' argument, that these allegations are not pled with sufficient specificity, never grapples with what is actually alleged in the Complaint. The City Defendants, for example, argue that Mrs. Koschman's allegations amount to a claim that the defendants participated in the conspiracy merely "by playing some part in the Koschman investigation, no matter how isolated or negligible." City Motion at 17. That contention is simply belied by the Complaint's detailed allegations of overt acts:

> ➢ Mrs. Koschman alleges that persons connected with Mayor Daley contacted the police soon after the assault for the purpose of influencing the investigation. Compl., ¶¶ 42-43.

> ➢ She alleges that as soon as police supervisors learned of Vanecko's connection to Mayor Daley, police detectives stopped investigating the assault, and that when Koschman's death forced them to re-open the investigation, multiple police officers fabricated evidence, altered their reports, and (along with Defendant O'Brien) conducted a lineup they knew to be unnecessary for the purpose of injecting confusion into the record. *Id.* ¶¶ 45-77.

> ➢ She alleges that experienced police and prosecutors failed to take notes at interviews or destroyed them, and that they both destroyed files or hid them in an effort to obliterate the evidence they contained. *Id.* ¶¶ 62, 72, 77, 88, 122-26.

> ➢ She alleges that senior police and prosecutors made knowingly false statements to the press, furthering the fabrications against David Koschman, and that based on those fabrications, these same senior officials declined to prosecute or seek charges against Vanecko. *Id.* ¶¶ 77, 78, 79, 106, 113-14, 115, 118, 119, 133.

> ➢ She alleges that police lied to her about the facts of the case, and warned her against looking into the matter further because she was opposed by powerful forces. *Id.* ¶ 80-81.

> ➢ She alleges that in contravention of multiple police procedures and despite multiple case-monitoring protocols, police took months to file the report of their original investigation, and then kept the case open from 2004 to 2011 in order to ensure that the fabricated version would not be exposed to her or to the public. *Id.* ¶¶ 81-84.

> ➢ She alleges that when the *Sun-Times* made a FOIA request for the Koschman file in 2011, multiple police officers conducted a sham investigation in an attempt to plug the inexplicable holes in the 2004 police investigation while continuing to shield Vanecko from culpability, which included falsifying interviews and making

34

alterations to reports of the incident to conform to the false explanation of the events that the police had originally concocted in 2004 (it also alleges that during this time, police involved in the 2011 investigation were in frequent contact with police who conducted the 2004 investigation). *Id.* ¶¶ 86-106.

➢ She alleges that prosecutors informally communicated with the police regarding the progress of the 2011 re-investigation, that prosecutors made a variety of knowingly false statements to the press furthering the false narrative, that they determined not to prosecute the case only minutes after formally receiving the case file from police, and that they fought to block efforts to have an independent investigation conducted. *Id.* ¶¶ 110-21.

Each of these allegations, and the others in the Complaint, include the identification by name of the person or persons who committed the acts. All describe when and how each act was accomplished. From this long chain of conduct—all in furtherance of the objective of protecting Vanecko and shielding the fraudulent investigation from discovery—the Complaint draws the inference that the defendants were acting pursuant to a single plan, reached tacitly or otherwise, to cover up Vanecko's culpability for David's death and thereby deprive Plaintiff of her right of access to the courts. *Cf. Hoffman-LaRoche v. Greenberg*, 447 F. 2d 872, 875 (7th Cir. 1971) (holding that evidence of "parallel transactions" among different conspirators is sufficient to support a finding of conspiracy). That inference, which is supported by abundant factual allegations, is more than reasonable, and thus survives a motion to dismiss.

## B. Each Co-conspirator Is Liable for the Misconduct of the Other Conspirators In Furtherance of the Conspiracy.

The SAO Defendants and O'Brien devote substantial portions of their respective briefs to the argument that the specific actions they are alleged to have committed—standing alone and without reference to the parallel misconduct of their alleged co-conspirators—are insufficient to support the inference that *they* deprived Mrs. Koschman of access to the courts or intentionally inflicted emotional distress. *See* SAO Motion at 6-8, 13-14; O'Brien Motion at 3-7.

35

This argument simply ignores the fact that the Complaint pleads a conspiracy. Conspiracy allegations function to "yoke particular individuals to the specific torts charged in the complaint." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988). Thus, "once the conspiracy is formed, all of its members are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy . . . . which is itself a tort." *Adcock,* 645 N.E.2d at 895. *Accord Garagher v. Marzullo*, 478 F. Supp. 2d 1008, 1012 (N.D. Ill. 2006) ("Co-conspirators are liable for acts taken by fellow conspirators in furtherance of the conspiracy." (citing *Jones*, 856 F.2d at 992)). Nor does it matter when different SAO Defendants might have joined the conspiracy, since "[e]ach conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy." *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981).

Therefore, the SAO Defendants and O'Brien, who are alleged to have participated in the same conspiracy with the City Defendants, are responsible for the actions that each and every City Defendant took in furtherance of their common plan. Even if the scope of a particular defendant's overt acts was relatively narrow, he is nonetheless bound by this rule. The SAO Defendants and O'Brien thus offer no reason why they should be dismissed from the case.

## IV. THE PROSECUTOR DEFENDANTS ARE NOT ENTITLED TO PROSECUTORIAL IMMUNITY OR EXECUTIVE PRIVILEGE ON THE DENIAL-OF-ACCESS CLAIM.

The SAO Defendants and O'Brien also move to dismiss the Complaint on grounds that they enjoy prosecutorial immunity and that their conduct was privileged. *See* O'Brien Motion at 10-11; SAO Motion 3-5, 11-12. These arguments fail.

**A. O'Brien and Devine's 2004 Conduct Is Beyond the Reach of Prosecutorial Immunity**.

As an initial matter, the SAO Defendants direct much of their fire on the wrong allegations. The Complaint does note that the SAO Defendants inexplicably failed to prosecute Vanecko for Koschman's death. The SAO Defendants focus on these allegations, emphasizing that they are entitled to prosecutorial immunity for the decision not to prosecute. *See* O'Brien Motion at 10; SAO Motion at 3-5. But the allegations against the SAO Defendants do not end there.

The Complaint alleges that O'Brien, before any charges had been brought, acted, in his role as a Felony Review Assistant, as an advisor to the police. It further alleges that he interviewed witnesses, took, then later destroyed, investigative notes, and participated with the Police Defendants in creating a false narrative, all with the purpose and result of depriving Mrs. Koschman of her access to the courts. Devine, in turn, approved the construction of this false narrative.

The Supreme Court has made clear that such actions, even if performed by a prosecutor, are investigative in nature, and as such are not afforded absolute prosecutorial immunity, particularly if the actions are taken before anyone is charged with a crime. In *Burns v. Reed*, 500 U.S. 478 (1991), the Supreme Court specifically held that a prosecutor who advises the police about whether to arrest and charge is not entitled to prosecutorial immunity. 500 U.S. at 495. And in *Buckley v. Fitzsimmons,* 509 U.S. 259 (1993), the Court held that a prosecutor who manufactures witness evidence before probable cause to arrest is established is likewise not entitled to absolute immunity. 509 U.S. at 272-76. *See also Tillman*, 813 F. Supp. 2d at 966-67; *Orange v. Burge*, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008*); Williams v. Valtierra*, 2001 WL 686782, at *2 (N.D. Ill. June 18, 2001); *Hill v. City of Chicago*, 2009 WL 174994, at

*11 (N.D. Ill. Jan. 26, 2009).  Hence it is plain that O'Brien (and Devine, who approved

O'Brien's non-prosecutorial manufacture of a false narrative) are not entitled to absolute

prosecutorial immunity for these actions.

**B.  The SAO Defendants Are Not Entitled to Prosecutorial Immunity for Their False Public Statements.**

The Complaint also alleges that the SAO Defendants all made or caused others to make

public statements to the media regarding the case, that these statements presented the knowingly

false narrative, and that they were intended to further the conspiracy, of which the SAO

defendants were part, to cover up Vanecko's culpability for his crime and thereby deprive Mrs.

Koschman of access to the courts.  *See* Compl., ¶¶ 115, 118, 119, 133, 134 (Alvarez); ¶¶ 115,

133 (Kirk); ¶ 77 (Devine); ¶ 115 (O'Brien).  Again in *Buckley*, the Supreme Court has ruled that

a prosecutor who makes public statements regarding a case is not performing a prosecutorial

function and thus does not enjoy absolute immunity.  *See Buckley*, 509 U.S. at 278.   Hence to

the extent the SAO Defendants move to dismiss the Complaint on grounds of prosecutorial

immunity, their motions must be denied.

**C.  The SAO Defendants' Motion to Dismiss the Complaint's State Law Claims on the Basis of "Executive Privilege" Must be Denied.**

The SAO Defendants argue that their public statements enjoy "executive privilege,"

which, they claim, provides them with absolute immunity from suit on Mrs. Koschman's state

law claims.  *See* O'Brien Motion at 11; SAO Motion at 12 (citing *Patterson*, 328 F. Supp. 2d at

901-09 (citing *Ware v. Carey*, 75 Ill. App. 3d 906 (Ill. Ct. App. 1979))).

In denying a prosecutor's motion to dismiss similar claims of executive privilege, Judge

Leinenweber recently held that "comments to the media have no functional tie to the judicial

process just because they are made by a prosecutor."  *Rivera*, 974 F. Supp. 2d at 1196 (quoting

*Buckley*, 509 U.S. at 277–78).  *Cf. Patterson*, 328 F. Supp. 2d at 892 (noting, in discussing prosecutorial immunity, that "[c]ourts are 'quite sparing' in recognizing absolute immunity for prosecutors in § 1983 actions and require defendant prosecutors to carry the burden of showing that such immunity is justified in their particular case" (quoting *Buckley*, 509 U.S. at 269)).  At this stage they have not done so.

Among other things, a prosecutor is not entitled to the privilege after the prosecutor's involvement in a criminal case has ended, or if the statements are not otherwise closely tied to the prosecution of the case.  *See Rivera*, 974 F. Supp. 2d at 1194.  Here, the prosecutor defendants simply declare that their statements to the press were connected to their prosecutorial function, without making any showing why this is so.

At this stage of the litigation, however, it is far from clear that their statements did have such a connection.  For example, the Complaint alleges that O'Brien made statements to the press in 2011, Compl. ¶ 115, yet his involvement in the case ended in 2004.  Likewise, Defendant Kirk, presumably at Alvarez's direction, made false statements about the case in 2012, *after* Judge Toomin had appointed the Special Prosecutor and specifically eliminated the SAO from any role in the case.  *Id.* ¶¶ 133, 134.  Nor is it at all clear that Alvarez's earlier 2011 statements to the press, made years after the SAO had declined to press charges in the case, had any relationship to her official duties—certainly, beyond invoking the privilege, she has made no such showing.  The SAO Defendants, in short, simply do not meet their burden to show that they are entitled to the executive privilege at the dismissal stage of the case.  *See Rivera*, 974 F. Supp. 2d at 1196-97 (noting that it is often appropriate to resolve claims of executive privilege only after discovery has occurred and the factual record has been established).  The SAO Defendants'

motion to dismiss Mrs. Koschman's state law claims on these grounds is thus inappropriate and should be denied.

## V.  NONE OF THE INDIVIDUAL DEFENDANTS IS ENTITLED TO QUALIFIED IMMUNITY.

The City Defendants argue that they are entitled to qualified immunity because the Complaint merely alleges that the police "characterized" David Koschman as the aggressor; there is no allegation that they characterized him as the "'physical' aggressor;" and "[i]t was not clearly established, at the time of the challenged conduct, that the City Defendants would be violating a clearly established right when they provided Plaintiff with a characterization of the witnesses' statements when Plaintiff had access to those very same statements."  City Motion at 20.

This argument deserves short shrift.  The City Defendants deliberately ignore the voluminous and detailed allegations in the Complaint of a conspiracy to conceal and fabricate evidence and create a false official record, all undertaken with the intent and for the specific purpose of covering up a crime and depriving Mrs. Koschman of access to the courts.  The misconduct alleged in the Complaint obviously violated settled law at the time of the defendants' misconduct in 2004 and thereafter.  *Bell v. City of Milwaukee* was decided in 1984.  *Christopher v. Harbury* approved and ratified *Bell*'s holding and reasoning in 2002.  No intervening decision has called those controlling precedents into question, and indeed, given the obviously illegal nature of such a cover-up, the defendants did not need either decision to inform them that their conduct was unconstitutional.  *See, e.g.*, *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (police defendants' alleged cover-up of evidence was "so egregious that no reasonable person could have believed that they were permissible" (quotation omitted)).

40

The defendants do not have a qualified immunity defense. Their arguments to the contrary should be summarily rejected.[9]

## VI.     COOK COUNTY IS A NECESSARY PARTY FOR PURPOSES OF INDEMNIFICATION.

Cook County argues that it should be dismissed from this case because there is no conduct alleged against it, and because it cannot be held liable under *Monell* or *respondeat superior*. These arguments are beside the point, since Mrs. Koschman makes no *Monell* or *respondeat superior* claims against the County. Rather, the Complaint names Cook County solely as a necessary party for purposes of indemnification of defendants O'Brien, Devine, Alvarez, and Kirk, who were employed by the Cook County State's Attorney's Office during the conduct alleged in the Complaint. *See* Compl. ¶ 28. It is clearly proper to name the County for this limited purpose. *See* 745 Ill. Comp. Stat. 10/9–102 (requiring the County to indemnify, among others, employees of the State's Attorney's Office for damages in cases such as this one); *Carver v. Sheriff of La Salle County,* 787 N.E.2d 127, 141 (Ill. 2003) (noting that a county is required to pay judgments entered against offices it funds); *National Cas. Co. v. McFatridge*, 604 F.3d 335, 345 (7th Cir. 2010) ("the county is only a necessary party to the suit so that, as an insurer or backstop for the independent official, it may veto improvident settlements." (quotation omitted)); *Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003) ("The responsibility for maintaining and funding [a county office] lies with [the] County. Under Illinois law, it is responsible for the payment of expenses and judgments emanating from the workings of that

---

[9] The City Defendants' citation to *Vasquez* and *Orange* for support is unavailing for the reasons stated in Section I, *supra* at pp. 19-21. Neither *Vasquez* nor *Orange* undermines in any way the settled nature of *Bell*'s holding and its applicability to this case.

[office].  The fact that some of the parties involved are state officials, as opposed to employees of [the] County, does not alter that fiscal responsibility.").

## VII.    THE CLAIMS AGAINST VANECKO SHOULD NOT BE DISMISSED WITH PREJUDICE.

Vanecko has moved to dismiss Mrs. Koschman's claims against him for David Koschman's death (Counts III, IV, and V), arguing, as an affirmative defense, that each claim is barred by the statute of limitations.  Vanecko Motion at 4-9.  The Complaint alleges that Vanecko assaulted David Koschman on April 25, 2004, Koschman died on May 6, 2004, and his death was ruled a homicide on May 8, 2004.  As Vanecko notes, the statutes of limitations on Counts III through V are one or two years, while the Complaint was filed in 2014.

Vanecko is able to make these arguments because he is the beneficiary of an extensive conspiracy among high-ranking government employees to hide his culpability for Koschman's death, for which he ultimately pled guilty and was incarcerated.  Vanecko was evidently aware of his culpability during the entire time before Mrs. Koschman filed her complaint, and thus there is little purpose in allowing him to now use the statute of limitations to hide from the consequences of his actions.  Mrs. Koschman therefore reserves all her rights against Vanecko, and opposes his motion to dismiss.

Additionally, if it is determined during the progress of this case that Vanecko is one of John Does 4-6 (*see* Compl. ¶ 30) and thus participated in the conspiracy to cover up his culpability for David Koschman's death, he would be unable to argue that the claims against him are time-barred for the same reasons as the other defendants, as explained herein.  Should the Court determine that the claims against Vanecko should be dismissed, therefore, Mrs. Koschman notes that this should be without prejudice to the re-assertion of such claims if discovery reveals that Vanecko participated in the alleged conspiracy.

42

**CONCLUSION**

For the foregoing reasons, all of the pending motions to dismiss should be denied.

Respectfully submitted,

**NANCI KOSCHMAN**


By:   Locke E. Bowman
       One of her attorneys

| | |
|---|---|
| Locke E. Bowman | G. Flint Taylor |
| Alexa Van Brunt | People's Law Office |
| Stephen H. Weil | 1180 North Milwaukee Ave. |
| Roderick and Solange MacArthur Justice Center | Chicago, IL 60642 |
| Northwestern University School of Law | (773)235-0070 |
| 375 East Chicago Ave. | |
| Chicago, IL 60611 | |
| (312)503-0844 | |